**EQUAL EMPLOYMENT OPPORTU-
NITY COMMISSION, Plaintiff–
Appellant, Cross–Appellee,**

v.

**CONSOLIDATED SERVICE SYSTEMS,
Defendant–Appellee, Cross–
Appellant.**

**Nos. 91–3530, 92–1879.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 20, 1992.

Decided March 4, 1993.

John P. Rowe, Zachary Alan Tobin, E.E.O.C., Chicago, IL, Jason S. Hegy, Susan Starr, E.E.O.C., Office of Gen. Counsel, Washington, DC, for E.E.O.C. in No. 91–3530.

Marvin F. Metge, Bruce C. Spitzer, Gorham, Metge, Bowman & Hourigan, Cary K. Kabumoto, Kabumoto & Malany, Chicago, IL, for defendant-appellee.

Robert E. Williams, Douglas S. McDowell, McGuiness & Williams, Washington, DC, for amicus curiae.

Susan Starr, E.E.O.C., Office of Gen. Counsel, Washington, DC, for E.E.O.C. in No. 92–1879.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The Equal Employment Opportunity Commission brought this suit in 1985 against a small company which provides janitorial and cleaning services at a number of buildings in the Chicago area. The owner of the company is a Korean immigrant, as are most of its employees. The suit charges that the company discriminated in favor of persons of Korean origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by relying mainly on word of mouth to obtain new employees. After a bench trial, the district judge dismissed the suit on the ground that the Commission had failed to prove discrimination, 777 F.Supp. 599 (N.D.Ill.1991), but he refused to award the defendant its attorney's fees, which the defendant had requested under provisions of law that have been interpreted to require that the suit have been frivolous. 42 U.S.C. § 2000e–5(k); 28 U.S.C. § 1927; Fed.R.Civ.P. 11; *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Hamer v. County of Lake*, 871 F.2d 58 (7th Cir.1989), 819 F.2d 1362, 1366–67 (7th Cir.1987); *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir.

1988); *Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1202 (7th Cir.1987). We do not know why the defendant did not request attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), under which its burden would have been lighter. *McDonald v. Schweiker*, 726 F.2d 311, 316 (7th Cir.1983). Both parties have appealed.

■ Between 1983, when Mr. Hwang, the company's owner, bought the company from its previous owner, also a Korean, and the first quarter of 1987, 73 percent of the applicants for jobs with Consolidated, and 81 percent of the hires, were Korean. Less than 1 percent of the work force in Cook County is Korean and at most 3 percent of the janitorial and cleaner work force. It doesn't take a statistician to tell you that the difference between the percentage of Koreans in Consolidated's work force and the percentage of Koreans in the relevant labor market, however exactly that market is defined, is not due to chance. But is it due to discrimination? The district judge found it was not, and we do not think his finding was clearly erroneous. *Pullman–Standard v. Swint*, 456 U.S. 273, 287–90, 102 S.Ct. 1781, 1789–91, 72 L.Ed.2d 66 (1982).

There is no direct evidence of discrimination. The question is whether the circumstantial evidence compels an inference of discrimination—*intentional* discrimination ("disparate treatment," in the jargon of Title VII cases), for the EEOC has not appealed from the district court's rejection of its disparate-impact theory of liability.

We said that Consolidated is a small company. The EEOC's lawyer told us at argument that the company's annual sales are only $400,000. We mention this fact not to remind the reader of David and Goliath, or to suggest that Consolidated is exempt from Title VII (it is not), or to express wonderment that a firm of this size could litigate in federal court for seven years (and counting) with a federal agency, but to explain why Mr. Hwang relies on word of mouth to obtain employees rather than reaching out to a broader community less heavily Korean. It is the cheapest method of recruitment. Indeed, it is practically costless. Persons approach Hwang or his employees—most of whom are Korean too—at work or at social events, and once or twice Hwang has asked employees whether they know anyone who wants a job. At argument the EEOC's lawyer conceded, perhaps improvidently but if so only slightly so, that Hwang's recruitment posture could be described as totally passive. Hwang did buy newspaper advertisements on three occasions—once in a Korean-language newspaper and twice in the *Chicago Tribune*—but as these ads resulted in zero hires, the experience doubtless only confirmed him in the passive posture. The EEOC argues that the single Korean newspaper ad, which ran for only three days and yielded not a single hire, is evidence of discrimination. If so, it is very weak evidence. The Commission points to the fact that Hwang could have obtained job applicants at no expense from the Illinois Job Service as further evidence of discrimination. But he testified that he had never heard of the Illinois Job Service and the district judge believed him.

If an employer can obtain all the competent workers he wants, at wages no higher than the minimum that he expects to have to pay, without beating the bushes for workers—without in fact spending a cent on recruitment—he can reduce his costs of doing business by adopting just the stance of Mr. Hwang. And this is no mean consideration to a firm whose annual revenues in a highly competitive business are those of a mom and pop grocery store. Of course if the employer is a member of an ethnic community, especially an immigrant one, this stance is likely to result in the perpetuation of an ethnically imbalanced work force. Members of these communities tend to work and to socialize with each other rather than with people in the larger community. The social and business network of an immigrant community racially and culturally distinct from the majority of Americans is bound to be largely confined to that community, making it inevitable that when the network is used for job recruitment the recruits will be drawn disproportionately from the community.

No inference of *intentional* discrimination can be drawn from the pattern we have described, even if the employer would prefer to employ people drawn predominantly or even entirely from his own ethnic or, here, national-origin community. Discrimination is not preference or aversion; it is acting on the preference or aversion. If the most efficient method of hiring, adopted *because* it is the most efficient (not defended because it is efficient—the statute does not allow an employer to justify intentional discrimination by reference to efficiency, 42 U.S.C. § 2000e–2(k)(2)), just happens to produce a work force whose racial or religious or ethnic or national-origin or gender composition pleases the employer, this is not intentional discrimination. *EEOC v. Chicago Miniature Lamp Works*, 947. F.2d 292, 299 (7th Cir.1991). The motive is not a discriminatory one. "Knowledge of a disparity is not the same thing as an intent to cause or maintain it." *American Nurses' Association v. Illinois*, 783 F.2d 716, 722 (7th Cir.1986). Or if, though the motives behind adoption of the method were a mixture of discrimination and efficiency, Mr. Hwang would have adopted the identical method of recruitment even if he had no interest in the national origin of his employees, the fact that he had such an interest would not be a "but for" cause of the discriminatory outcome and again there would be no liability. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 658 (7th Cir. 1991) (en banc); *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 (10th Cir.1992). There is no evidence that Hwang *is* biased in favor of Koreans or prejudiced against any group underrepresented in his work force, except what the Commission asks us to infer from the imbalance in that force and Hwang's passive stance.

We said the passive stance is the cheapest method of recruitment. It may also be highly effective in producing a good work force. There are two reasons. The first is that an applicant referred by an existing employee is likely to get a franker, more accurate, more relevant picture of working conditions than if he learns about the job from an employment agency, a newspaper ad, or a hiring supervisor. The employee can give him the real low-down about the job. The result is a higher probability of a good match, and a lower probability that the new hire will be disappointed or disgruntled, perform badly, and quit. Second, an employee who refers someone for employment may get in trouble with his employer if the person he refers is a dud; so word of mouth recruitment in effect enlists existing employees to help screen new applicants conscientiously.

If this were a disparate-impact case (as it was once, but the Commission has abandoned its claim of disparate impact), and, if, contrary to *EEOC v. Chicago Miniature Lamp Works, supra*, 947 F.2d at 304–05, word of mouth recruitment were deemed an employment practice and hence was subject to review for disparate impact, as assumed in *Clark v. Chrysler Corp.*, 673 F.2d 921, 927 (7th Cir.1982), and held in *Thomas v. Washington County School Board*, 915 F.2d 922, 924–26 (4th Cir.1990), then the advantages of word of mouth recruitment would have to be balanced against its possibly discriminatory effect when the employer's current work force is already skewed along racial or other disfavored lines. But in a case of disparate treatment, the question is different. It is whether word of mouth recruitment gives rise to an inference of intentional discrimination. Unlike an explicit racial or ethnic criterion or, what we may assume without deciding amounts to the same thing, a rule confining hiring to relatives of existing employees in a racially or ethnically skewed work force, as in *Thomas v. Washington County School Board, supra*, word of mouth recruiting does not compel an inference of intentional discrimination. At least it does not do so where, as in the case of Consolidated Services Systems, it is clearly, as we have been at pains to emphasize, the cheapest and most efficient method of recruitment, notwithstanding its discriminatory impact. Of course, Consolidated had some non-Korean applicants for employment, and if it had never hired any this

would support, perhaps decisively, an inference of discrimination. Although the respective percentages of Korean and of non-Korean applicants hired were clearly favorable to Koreans (33 percent to 20 percent), the EEOC was unable, as explained more fully below, to find a single person out of the 99 rejected non-Koreans who could show that he or she was interested in a job that Mr. Hwang ever hired for. Many, perhaps most, of these were persons who responded to the ad he placed in the *Chicago Tribune* for a contract that he never got, hence never hired for.

The Commission cites the statement of Consolidated's lawyer that his client took advantage of the fact that the Korean immigrant community offered a ready market of cheap labor as an admission of "active" discrimination on the basis of national origin. It is not discrimination, and it is certainly not active discrimination, for an employer to sit back and wait for people willing to work for low wages to apply to him. The fact that they are ethnically or racially uniform does not impose upon him a duty to spend money advertising in the help-wanted columns of the *Chicago Tribune*. The Commission deemed Consolidated's "admission" corroborated by the testimony of the sociologist William Liu, Consolidated's own expert witness, who explained that it was natural for a recent Korean immigrant such as Hwang to hire other recent Korean immigrants, with whom he shared a common culture, and that the consequence would be a work force disproportionately Korean. Well, of course. People who share a common culture tend to work together as well as marry together and socialize together. That is not evidence of illegal discrimination.

Although the Commission's witness list contained the names of 99 persons whom Hwang had refused to hire allegedly because they were not Korean, at trial it presented only four of these persons as witnesses. One was a woman whose national origin the record does not disclose, but we shall assume that she is not Korean. She applied for a job with Consolidated in response to one of the ads he had placed in the *Tribune*. She was not hired.

Hwang testified that he hired no one who responded to the ad because he failed to receive the contract which he had placed the ad in expectation of receiving. The district judge believed him. The judge also thought it odd that this witness had been a receptionist both before she applied for the job with Consolidated and after she failed to get it. He doubted that she had really wanted a job cleaning buildings.

The next witness had responded to the same ad. His national origin, too, is not of record but we may assume from his name and from the fact that the EEOC offered him as a witness that he is not Korean. Apart from believing Hwang's testimony that the ad had been placed to obtain workers for a job that never materialized, the judge found this witness's testimony "incredible," in part because he gave contradictory evidence. The judge disbelieved the third witness as well, sensing that he had not really wanted a job with Consolidated because he had just quit a higher-paying job. The last witness was adamant that he had learned about the job opening at Consolidated from the *Chicago Sun-Times*, in which Consolidated had never advertised. In addition, he had been fired from his previous job because he had been caught stealing from his employer. He also testified that he was seeking a job that paid almost twice what Consolidated was offering.

This was a sorry parade of witnesses, especially when we recall that the Commission culled it from a list of 99. We can hardly fault the district judge for concluding from all the evidence that the Commission had failed to prove that Consolidated was deliberately discriminating in favor of Koreans.

In a nation of immigrants, this must be reckoned an ominous case despite its outcome. The United States has many recent immigrants, and today as historically they tend to cluster in their own communities, united by ties of language, culture, and background. Often they form small businesses composed largely of relatives, friends, and other members of their community, and they obtain new employees by

word of mouth. These small businesses—grocery stores, furniture stores, clothing stores, cleaning services, restaurants, gas stations—have been for many immigrant groups, and continue to be, the first rung on the ladder of American success. Derided as clannish, resented for their ambition and hard work, hated or despised for their otherness, recent immigrants are frequent targets of discrimination, some of it violent. It would be a bitter irony if the federal agency dedicated to enforcing the antidiscrimination laws succeeded in using those laws to kick these people off the ladder by compelling them to institute costly systems of hiring. There is equal danger to small black-run businesses in our central cities. Must such businesses undertake in the name of nondiscrimination costly measures to recruit nonblack employees?

■ Although Consolidated has been dragged through seven years of federal litigation at outrageous expense for a firm of its size, we agree with the Commission that this suit was not frivolous. The statistical disparity gave the Commission a leg up, and it might conceivably have succeeded in its disparate-impact claim but for our intervening decision in *EEOC v. Chicago Miniature Lamp Works, supra.* Had the judge believed the Commission's witnesses, the outcome even of the disparate-treatment claim might have been different. The Equal Access to Justice Act was intended, one might have thought, for just such a case as this, where a groundless but not frivolous suit is brought by the mighty federal government against a tiny firm; but Consolidated concedes its inapplicability. We do not know on what the concession is based—possibly on cases like *Escobar Ruiz v. INS*, 787 F.2d 1294, 1296 (9th Cir.1986), on rehearing, 838 F.2d 1020, 1027–28 (9th Cir.1988) (en banc), holding the Act inapplicable to statutes that have their own fee-shifting statutes—but other cases, such as *Gavette v. Office of Personnel Management*, 808 F.2d 1456, 1463–65 (Fed.Cir.1986), are *contra.* It may not be too late for Consolidated to reconsider its concession in light of our holding in *McDonald v. Schweiker, supra,* 726 F.2d at

314, regarding the deadline for seeking fees under the Act.

AFFIRMED.