Mary J. CARR, Plaintiff–Appellant,

v.

ALLISON GAS TURBINE DIVISION,
GENERAL MOTORS CORPORA-
TION, Defendant–Appellee.

No. 93–2338.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1994.

Decided July 26, 1994.

Lester H. Cohen (argued), John H. Haskin, Haskin & Associates, Brenda Franklin Rodeheffer, Indianapolis, IN, for Mary J. Carr.

Wendell R. Tucker, Baker & Daniels (argued), Indianapolis, IN, for Allison Gas Turbine Div., General Motors Corp.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

POSNER, Chief Judge.

■ Mary Carr brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, against her former employer, a division of General Motors, charging sexual harassment and seeking backpay and other relief. After a bench trial, the district judge rendered judgment for General Motors. Apparently fearful that the clear-error standard which governs our review of findings of fact and applications of rules to fact imposes an insuperable burden on an appellant, Carr's lawyer strained to persuade us at oral argument that the district judge's opinion is infected by legal error, and specifically by a failure to have anticipated a decision by the Supreme Court handed down after he wrote his opinion. *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Such an approach is needlessly defensive, for despite colorful language in some decisions, e.g., *Parts & Electric Motors, Inc. v. Sterling Electric, Inc.,* 866 F.2d 228, 233 (7th Cir.1988); *United States v. Markling,* 7 F.3d 1309, 1319 (7th Cir.1993), it is not true that the clear-error standard imposes an insuperable burden on appellants. *Sante Fe Pacific Corp. v. Central States, Southeast & Southwest Areas Pension Fund,* 22 F.3d 725, 727–28 (7th Cir. 1994). It requires us appellate judges to distinguish between the situation in which we *think* that if we had been the trier of fact we would have decided the case differently and the situation in which we are *firmly convinced* that we would have done so. *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* —— U.S. ——, —— – ——, 113 S.Ct. 2264, 2279–80, 124 L.Ed.2d 539 (1993); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Our scrutiny of the district judge's findings of fact thus is deferential, but it is not abject. As the Supreme Court pointed out in the *Concrete Pipe* case, we need not, to overturn a finding under the clear-error standard, adjudge the finding "so unlikely that no reasonable person would find it to be true." —— U.S. at ——, 113 S.Ct. at 2280.

■ The district judge believed that in a case such as this in which the harassment is by coworkers rather than by supervisors, the principal questions to be answered are whether the plaintiff was in fact sexually harassed to a degree that could be said to affect adversely the conditions under which she worked, whether it was unwelcome harassment, and whether management knew or should have known about the harassment yet failed to take appropriate remedial action. The only exceptionable entry in this catalog is the question about unwelcomeness. "Welcome sexual harassment" is an oxymoron; if as we concluded in *Reed v. Shepard,* 939 F.2d 484, 486–87 (7th Cir.1991), the employee demonstrates by word or deed that

the "harassment" is welcome (the plaintiff in that case had instigated sexual pranks—for example, had given one of her male coworkers a softball warmer designed to resemble a scrotum), it is not harassment. So there really are only two questions in a case such as this. The first is whether the plaintiff was, because of her sex, subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked; for Title VII is not directed against unpleasantness per se but only, so far as relates to this case, against discrimination in the conditions of employment. *Harris v. Forklift Systems, Inc., supra,* —— U.S. at ——, 114 S.Ct. at 371; *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The second question is whether, if so, the defendant's response or lack thereof to its employees' behavior was negligent. *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535–36 (7th Cir.1993); *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 320–21 (7th Cir.1992); *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463 (7th Cir.1990). It would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee. But if it knows or should have known that one of its female employees is being harassed, yet it responds ineffectually, it is culpable. The two questions, harassment of the employee and negligence of the employer, are linked as a practical matter because the greater the harassment—the more protracted or egregious, as distinct from isolated (as in *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993), and *King v. Board of Regents,* 898 F.2d 533, 537 (7th Cir.1990)) or ambiguous, it is—the likelier is the employer to know about it or to be blameworthy for failing to discover it.

■ The district judge did not formulate the legal standard in precisely these terms but he was close enough that we cannot find any error of law. If there was any error it was in the application of the legal standard to the facts, facts that we must treat as largely undisputed because the district judge believed the testimony of Carr and her witnesses and disbelieved the defendant's testimony where it differed from the plaintiff's. Dis-

putes over the application of an agreed legal standard to the facts are just as much subject to the clear-error standard as disputes over the facts themselves (see *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1269–70 (7th Cir.1991), so holding with specific reference to discrimination), but we think there was clear error and point out that when the issue is whether the law was properly applied to the facts, questions of credibility, the resolution of which is rarely subject to effective appellate review, *Anderson v. City of Bessemer City, supra,* 470 U.S. at 575, 105 S.Ct. at 1512; *Winchester Packaging, Inc. v. Mobil Chemical Co.,* 14 F.3d 316, 319 (7th Cir. 1994), drop out. Insofar as there are credibility issues in this case, the district judge resolved them, as we have said, in favor of Carr. We are not entitled to reopen those issues, though invited by GM, in its brief and at argument, to do so.

■ Carr was a drill operator in GM's gas turbine division when, in August 1984, she entered the skilled trades in the division as a tinsmith apprentice. She was the first woman to work in the tinsmith shop, and her male coworkers were unhappy about working with a woman. They made derogatory comments of a sexual character to her on a daily basis (such as, "I won't work with any cunt"), continually referred to her in her presence by such terms as "whore," "cunt," and "split tail," painted "cunt" on her toolbox, and played various sex- or gender-related pranks on her, such as painting her toolbox pink and (without her knowledge) cutting out the seat of her overalls. They festooned her tool box and work area with signs, pictures, and graffiti of an offensive sexual character, hid and stole her tools, hid her toolbox, hung nude pin-ups around the shop, and would strip to their underwear in front of her when changing into and out of their work clothes. One of them placed an obscene Valentine Day's card, addressed to "Cunt," on her toolbox. The card shows a man carrying a naked woman upside down, and the text explains that the man has finally discovered why a woman has two holes—so that she can be carried like a six-pack. A worker named Beckham twice exhibited his penis. The first time, during an argument in which Carr told

him the exit door "swings both ways," meaning that he could leave just as easily as she could, he replied that he had something that "swings," and he demonstrated. The second time, another male worker bet Beckham $5 that he would not expose himself. He lost the bet, although it is unclear whether Carr was in front of Beckham or behind him. And it was Beckham who told Carr on another occasion that if he fell from a dangerous height in the shop she would have to give him "mouth to dick" resuscitation. Carr's male coworkers urinated from the roof of the shop in her presence, and, in her hearing, one of them accused a black employee who was only intermittently hostile to Carr of being "after that white pussy, that is why you want a woman here, you want some of that." A number of racist remarks and practical jokes of a racial nature were directed against this, the only black employee among the tinsmiths. A frequent remark heard around the shop was, "I'll never retire from this tinsmith position because it would make an opening for a nigger or a woman." Another of Carr's male coworkers threw a burning cigarette at her.

At first she disregarded the harassment but beginning in 1985 and continuing until 1989, when she quit—constructively discharged, she contends, the situation having become unbearable—she complained about the harassment repeatedly to her immediate supervisor, Jim Routh. To no avail. He testified that even though some of the offensive statements were made in his presence, not being a woman himself he was not sure that the statements would be considered offensive by a woman. His perplexity was such that when he heard the statements he would just chuckle and bite down harder on his pipe.

▪ The district judge rejected the company's argument that the words and conduct that we have described were mere vulgar pleasantries, what is euphemistically known as "shop talk." Workers, like other people, often are foul-mouthed (Beckham was clocked using the word "fuck" between 50 and 60 times in a period of ten minutes), and while there are still people in this country, male as well as female, who are deeply of-fended by dirty words, employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620–21 (6th Cir.1986); *Ebert v. Lamar Truck Plaza*, 878 F.2d 338, 339 (10th Cir.1989). Yet there are gradations even here, and the district judge was surely correct that the words and deeds of Mary Carr's male coworkers crossed the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing. For one thing, the words and acts of which she complains were, unlike what may have been the situation in *Sauers v. Salt Lake County*, 1 F.3d 1122, 1127 (10th Cir. 1993), targeted on her, and it is a lot more uncomfortable to be the target of offensive words and conduct than to be merely an observer of them. Patricia J. Williams, *The Alchemy of Race and Rights: Diary of a Law Professor* 129 (1991). For another thing, defacing a person's property (even if it is hers just to use while at work) and mutilating her clothing (even if it is hers just to wear while at work) are more ominous, more aggressive affronts than mere words.

So the behavior of Carr's coworkers was harassing, yet the district judge concluded that it was not actionable, because it had been "invited." "[S]he was not merely the recipient of crude behavior and crude language—she also dished it out." A female welder, who worked in proximity to the tinsmiths, considered Carr vulgar and unladylike, a "tramp," because she used the "F word" and told dirty jokes. This woman further testified that she herself had no trouble with the men in the shop—though occasionally she did have to zap them with her welding arc to fend them off. Carr indeed used such terms as "fuck head" and "dick head," once placed her hand on the thigh of a young male worker, and, when shown a pornographic picture and asked to point out the clitoris, obliged. Once when her tool bench was moved (apparently not with hostile intent), she got into a shouting match with her coworkers. General Motors' brief describes her as "vulgar, confrontational, profane, lazy and vindictive." The district judge said that "she contributed just as much abusive language and crude behavior as did the male

tinners, and therefore was just as responsible for any hostile sexual environment that consequently arose." "[T]he tinners' conduct, to the extent it may have constituted sexual harassment, was not unwelcome."

Of course it was unwelcome. A plaintiff's words, deeds, and deportment can cast light on whether her coworkers' treatment of her was unwelcome and should have been perceived as such by them and their supervisors, *Meritor Savings Bank v. Vinson, supra,* 477 U.S. at 69, 106 S.Ct. at 2406–07, but we do not understand General Motors to be suggesting that Carr enjoyed or appeared to enjoy the campaign of harassment against her. In this regard the case is different from *Reed v. Shepard, supra,* on which General Motors relies, where the plaintiff had manifested "enthusiastic receptiveness to sexually suggestive jokes and activities." 939 F.2d at 491. Reed, a corrections officer, never complained about sexual harassment, and rather than resigning because the conditions of her employment became intolerable was fired for encouraging two inmates to beat a third. The district judge made no finding of "enthusiastic receptiveness" in the present case, and could not have done so, since Carr's violent resentment of the conduct of her male coworkers toward her is plain. What the judge found, rather, was that Carr had *provoked* the misconduct of her coworkers. Had she been ladylike, he thought, like the welder, they would have left her alone—maybe; for remember that the welder had to use her welding arc to protect herself, and Carr was not so equipped.

Even if we ignore the question why "unladylike" behavior should provoke not a vulgar response but a hostile, harassing response, and even if Carr's testimony that she talked and acted as she did in an effort to be "one of the boys" is (despite its plausibility) discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct and exonerate their employer. *Karibian v. Columbia University,* 14 F.3d 773, 778 (2d Cir.1994); *Burns v. McGregor Electronic Industries, Inc.,* 989 F.2d 959, 962 (8th Cir.1993); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987). The asymmetry of positions must be considered. She was

one woman; they were many men. Her use of terms like "fuck head" could not be deeply threatening, or her placing a hand on the thigh of one of her macho coworkers intimidating; and it was not she who brought the pornographic picture to the "anatomy lesson." We have trouble *imagining* a situation in which male factory workers sexually harass a lone woman *in self-defense* as it were; yet that at root is General Motors' characterization of what happened here. It is incredible on the admitted facts.

█ The judge had alternative grounds to "welcome harassment" for dismissing Carr's case. One is that even if she was harassed, it had no effect on the conditions of her employment. Carr had a very poor attendance record in the tinsmith shop, partly for physical and partly for psychiatric reasons, and while she attributed some of her psychiatric problems (mainly depression) to the sexual harassment she received from her coworkers, there plainly were other factors in play as well. She had a troubled life. Her foster son had been executed for murder, and one of the charming comments that Beckham (the coworker who had exposed himself to her) had made to her was that he would have been happy to pay the electrical bill for the execution. The judge concluded that Carr had "suffered because she was in a vulnerable, emotionally fragile state, because she was having difficulty coping with her many personal, non-job problems, and because she missed so much work for non-harassment reasons, thereby severely damaging shop morale and efficiency." These observations would be pertinent if Carr were seeking damages for mental anguish caused by sexual harassment, but she is not. All she need show is that her conditions of employment were adversely affected. If because she was a woman General Motors had turned down the heat at her work station in order to make her uncomfortable, that would be actionable sex discrimination, even if the discomfort inflicted was too mild to be described as "suffering." *Harris v. Forklift Systems, Inc., supra,* —— U.S. at ——–——, 114 S.Ct. at 370–71. To obtain a remedy for constructive discharge, all Carr had to show was that the discrimination to which she was subjected was sufficiently serious to cause a reasonable

person to quit. *Townsend v. Indiana University,* 995 F.2d 691, 693 (7th Cir.1993). The judge did not reach the question whether Carr had been constructively discharged or the further question whether, even if so, she would have quit anyway (or been fired) for reasons unrelated to sex, in which event the employer would not be liable. *EEOC v. Consolidated Service Systems,* 989 F.2d 233, 236 (7th Cir.1993); *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 658 (7th Cir.1991) (en banc); cf. *Bohen v. City of East Chicago,* 799 F.2d 1180, 1183 (7th Cir. 1986). General Motors never made the second argument, so it has been waived.

■ The judge further ruled that "even if Carr were to show that she was subjected to unwelcome harassment, and that she was adversely affected by it, her claim still would fail because she has not shown that [GM] neglected to take appropriate responsive action." We said that the standard was negligence, and we think it plain that negligence was proved. Carr began complaining to Routh, her immediate supervisor, in 1985, and four years later nothing had been done to correct the situation. The judge elicited from Routh's supervisor an affirmative answer to the question, "So you, more or less, left these gals alone to develop their own methods of coping on the job?" Nevertheless the judge's opinion depicts General Motors as the victim of a conspiracy of silence among the tinsmiths. They would have thwarted any investigation by Routh (not that one was made), preferring, said the judge, "letting a foul-mouthed few set low standards of behavior to enforcing any collective standard that embraces at least some element of civility or decency." We do not find the picture of mighty GM helpless in the face of the foul-mouthed tinsmiths remotely plausible, but will pass the point by since the district judge acknowledged that beginning in August 1988 "Carr did maintain legitimate, active complaints; however, ... Allison responded adequately to these." The responses were limited to several meetings that the company arranged between Carr and her tormentors, at one of which she and Beckham were asked to apologize to each other. No disciplinary action was undertaken against any of Carr's coworkers; no one

was even reprimanded for the harassment. General Motors was astonishingly unprepared to deal with problems of sexual harassment, foreseeable though they are when a woman is introduced into a formerly all-male workplace. Supervisor Routh testified that if he encountered a problem of sexual harassment he would have to ask the personnel department what to do. *His* supervisor's recipe for solving problems of sexual harassment was to recommend that the woman work harder than the men to prove she could do the job. The personnel director of the gas turbine division acknowledged that the distribution of policies and posters dealing with problems of sexual harassment was "uncertain," and he could not remember having read any of them himself until shortly before he testified. At one of the meetings with Carr, management agreed to order a videotape on sexual harassment to show to the workforce, but it was never shown, a failure that Routh's supervisor blamed on the personnel department.

It is difficult for an employer to sort out charges and countercharges of sexual harassment among feuding employees, but we are dealing here with a situation in which for years one of the nation's largest enterprises found itself helpless to respond effectively to an egregious campaign of sexual harassment directed at one woman. No reasonable person could imagine that General Motors was genuinely helpless, that it did all it reasonably could have done. The evidence is plain that it (or at least its gas turbine division) was unprepared to deal with problems of sexual harassment even when those problems were rubbed in its face, and also incapable of improvising a solution. Its efforts at investigation were lackluster, its disciplinary efforts nonexistent, its remedial efforts perfunctory. The U.S. Navy has been able to integrate women into the crews of warships; General Motors should have been able to integrate one woman into a tinsmith shop.

The judgment is reversed with instructions to enter judgment on liability for the plaintiff (since no other result would be consistent with the record, *In re Marchiando,* 13 F.3d 1111, 1114 (7th Cir.1994)) and proceed to a

determination of the remedy to which she is entitled.

REVERSED AND REMANDED.

COFFEY, *Circuit Judge,* dissenting.

Initially, I am compelled to state that the conduct of some of the General Motors employees in this case, including the plaintiff-appellant Mary Carr, is appalling, disgusting and has no place in the work environment. Nonetheless, I am unwilling to join in the majority opinion because I believe it overrules the precedent in our circuit concerning "unwelcomed" sexual harassment, *Reed v. Shepard,* 939 F.2d 484, 491 (7th Cir.1991) (a decision joined in by the author of today's majority opinion).

As an initial matter, let us keep in mind that the standard of review is *whether the trial court committed clear error.* The U.S. Supreme Court recently stated that the clear error standard is *"significantly deferential,"* *Concrete Pipe & Products v. Construction Laborers Pension Trust,* — U.S. —, —, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993) (emphasis added), and requires a reviewing court to *uphold the findings of the lower court* unless there is a *"definite and firm conviction that a mistake has been committed."* *Id.* at —, 113 S.Ct. at 2279 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)) (emphasis added). I remain convinced as this court has often stated, that *the trial court is in the best position to resolve factual questions because it has "the best opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject[s'] reactions and responses to the interrogatories, their facial expressions, atti-* tudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record."* *United States v. Duarte,* 1 F.3d 644, 651 (7th Cir.1993) (citations omitted) (emphasis added), *cert. denied,* — U.S. —, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). Had I been the trier of fact, I may or may not have reached the same conclusion as the trial judge, but *"it is not the function of this court to reweigh the evidence or to substitute its judgment for that of the trier of fact."* *Dugan v. United States,* 18 F.3d 460, 463 (7th Cir.1994) (quoting *United States v. Wisniewski,* 741 F.2d 138, 144 (7th Cir.1984)) (emphasis added).

In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986), a bank supervisor had regular sexual intercourse with a female bank employee often against her will. The U.S. Supreme Court stated that "[t]he correct inquiry is whether [the victim] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.* Relying on *Meritor,* we stated in *Reed v. Shepard,* 939 F.2d 484, 491 (7th Cir.1991), a case that is indistinguishable from the case before us, that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* (quoting *Meritor Sav. Bank,* 477 U.S. at 68, 106 S.Ct. at 2406). In *Reed,* a discharged female civilian jailer sued the sheriff and the sheriff's department alleging, among other things, sexual harassment. The alleged harassing conduct in *Reed* was even more "egregious"[1] than this case yet the court found for the defendants stating

---

1. The appellate court opinion quoted the district court's findings as follows:
   "Plaintiff contends that she was handcuffed to the drunk tank and sally port doors, that she was subjected to suggestive remarks ..., that conversations often centered around oral sex, that she was physically hit and punched in the kidneys, and that her head was grabbed and forcefully placed in members [sic] laps, and that she was the subject of lewd jokes and remarks. She testified that she had chairs pulled out from under her, a cattle prod with an electrical shock was placed between her legs, and that they frequently tickled her. She was placed in a laundry basket, handcuffed inside an elevator, handcuffed to the toilet and her face pushed into the water, and maced. ..."
   *Reed,* 939 F.2d at 486. When questioned why she tolerated such behavior, Reed responded not unlike Carr in the case before us, "Because it was real important to me to be accepted. It was important for me to be a police officer and if that was the only way that I could be accepted, I would just put up with it and kept [sic] my mouth shut." *Id.* at 492. If Carr's allegations were true, I doubt she would have waited over three years to make them known.

Much of the evidence at trial emphasized Reed's enthusiastic receptiveness to sexually suggestive jokes and activities. The record of this case reveals numerous instances indicating that Reed's preferred method of dealing with co-workers was with sexually explicit jokes, suggestions and offers.... From the foregoing, the district court is justified where it held: "The Court finds that language and sexually explicit jokes were used around plaintiff because of her personality rather than her sex."

\*    \*    \*    \*    \*    \*

Although Reed suggests that tolerating and contributing to the crudeness of the jail was necessary for her career, other female employees testified that the male jail employees did not behave in this manner around women who asked them not to. The trial court's conclusion that Reed welcomed the sexual hijinx of her co-workers is strongly supported by the evidence presented at trial. This showing that she welcomed the activity is fatal to her claim, particularly where Reed admits that the "harassment" did not adversely affect her ability to do her job.... We agree with the trial court's holding in this regard that, "[t]he defendants cannot be held liable for conditions created by [Reed's] own action and conduct."

*Reed*, 939 F.2d at 491–92 (footnotes omitted). The defendants cite numerous other lower court opinions adopting this approach. *See Perkins v. General Motors Corporation*, 709 F.Supp. 1487, 1500 (W.D.Mo.1989) ("Perkins was an active, encouraging participant in sexually explicit conversations and actions"), *aff'd in relevant part*, 911 F.2d 22 (8th Cir. 1990), *cert. denied*, 499 U.S. 920, 111 S.Ct. 1309, 113 L.Ed.2d 243 (1991); *Weinsheimer v. Rockwell Int'l. Corp.*, 754 F.Supp. 1559, 1564 (M.D.Fla.1990) ("plaintiff's willing and frequent involvement in the sexual innuendo prevalent in her work area indicates that she did not find the majority of such conduct truly 'unwelcome' or 'hostile'"); *Loftin–Boggs v. City of Meridian*, 633 F.Supp. 1323, 1327 (S.D.Miss.1986) ("plaintiff often made jokes about sex and participated in frequent discussions and bantering about sex"), *aff'd*,

824 F.2d 971 (5th Cir.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988); *Gan v. Kepro Circuit Systems*, 28 FEP Cases 639 (E.D.Mo.1982) (plaintiff actively contributed to the distasteful working environment).

The majority makes an attempt to distinguish the instant case from *Reed* by stating Carr did not manifest "enthusiastic receptiveness to sexually suggestive jokes and activities" as Reed had. *Reed*, 939 F.2d at 491. This distinction escapes me given the trial court's explicit finding on the issue of Carr's receptiveness to the crude conduct

Carr *invited* and encouraged the bad language, crude jokes, and constant sexual references which abounded in the tin shop, so that the tinners' conduct, to the extent it may have constituted sexual harassment, was not unwelcome. *See Reed*, 939 F.2d at 491–92 (plaintiff's *"enthusiastic receptiveness to sexually suggestive jokes and activities"* indicated that harassing conduct was not unwelcome).

Mem. Op. at 32 (emphasis added). How can the majority claim that *Carr* is distinguishable from *Reed* in view of the fact that the district judge made a specific finding that Carr "invited" the crude behavior and cited the very language in *Reed* that the majority claims distinguishes the two cases? In contrast to the trial court's findings, the majority insists that Reed was *receptive* to the crude behavior while Carr *provoked* the crudeness from her male co-workers. *See ante* at 1011. Such a distinction is implausible given the lower court's *clear and unambiguous holding*, quoted above, which states Carr *"invited and encouraged the bad language, crude jokes, and constant sexual references"* and cites to the very language in *Reed* dealing with *"enthusiastic receptiveness."* (Emphasis added).

The majority attempts to distinguish *Reed* on the grounds that she "never complained about sexual harassment" and she was fired for her misconduct on the job, *ante* at 1011, yet the court in *Reed* did not rely on her lack of complaint, rather *the court based its decision on her participation in the sexual talk and pranks. See Reed*, 939 F.2d at 491–92. Moreover, the fact that Reed was terminated

while Carr resigned is of no consequence for GM might very well have discharged Carr for her acute absenteeism. *See infra* at 1015. In an attempt to second guess and downplay the trial court's unmistakable holding that Carr welcomed the conduct as Reed had, the majority insists that Carr, unlike Reed, manifested "violent resentment" toward the male tinners conduct and thus did not welcome it. *Ante* at 1011. From my review of this record, I have been unable to discover any evidence of Carr's "violent resentment" of the crude conduct other than the two complaints she filed with management (several years after the alleged harassing acts and shortly before her resignation). What the record does reveal, as I discuss *infra* at 1015–16, is evidence that Carr was every bit as foul-mouthed, crude and willing to partake in pranks of a sexual nature as the men in the shop as well as the fact that Carr owned up to her responsibility for adding to the poor relationship she had with the male tinners.

I choose not to recite the language she used because I do not believe that quoting vulgar language contributes to the development of the body of law. However, the record does reveal fifteen specific references to the plaintiff Carr's repeated use of crude/sexual language, crude behavior and obscene story-telling. *Reed* was decided by this court in August of 1991 and the present case was argued before the court in February of 1994. It certainly is a matter of concern, in the absence of any directive from the Supreme Court, that the majority has seen fit to change the Circuit's law on harassment, for how is industry to implement new rules and regulations when the standards are ever-changing?

An example of the majority's sugar coating the facts is the mischaracterization of the district court's holding and the defendant's argument on the issue of "unwelcomeness," stating "[w]e have trouble even *imagining* a situation in which male factory workers sexually harass a lone woman *in self-defense* as it were; yet that at root is General Motors' characterization of what happened here. It is incredible on the admitted facts." *Ante* at 1011. The point is not that the male tinners

were *defending* themselves from this "lone woman," but rather that within the tinsmith shop there was a great deal of good-natured bantering, intermingled with unnecessary, repulsive, crude, sexual talk and innuendo. If Carr received more than her share of verbal abuse, a point I find very questionable based upon the record before us, it might very well have been due to factors other than her being a woman. For example, the majority glosses over the fact that she had an abysmal work attendance record that caused a great deal of consternation, discontent and even anger among the tinners who in all probability believed General Motors was overlooking her all-too-frequent absences from the workplace because she was a woman. The district court found that in Carr's four-plus years on the job in the tinsmith shop she was absent over thirty percent of her scheduled work periods (*she missed some 395 work days between 1984 and 1989*). The trial judge clearly took note of the impact of her absenteeism, stating

> "[t]hese missed days had a very negative impact on shop morale. Tinners work together and rely on each other (including apprentices) to get particular jobs done. Regular, uninterrupted attendance is therefore quite important to smooth shop operation and to morale as a whole. The truth of this statement is evidenced by Routh's alleged comment to Carr, made after one of her numerous complaints, that the tinners 'would treat you better if you'd come to work.' "

Mem. op. at 14–15. If General Motors is to be criticized, it is for not discharging an employee whose acute absenteeism syndrome was causing severe morale problems within the tinshop. At the same time, GM should be commended for going out of the way to accommodate Carr during her absences due to her alleged health and/or psychological problems stemming from her stepson's execution.

In addition to her absenteeism, the record, considered as a whole, offers ample support for the conclusion of the experienced trial judge that Mary Carr was a participant in

the ribald antics of the tinshop.[2] For years she actively participated in the vulgarities of life in the tinsmith's shop. She now claims that she was a victim of the uninvited antics but as in *Reed,* Carr's words and conduct belie her argument. The trial judge summarized her conduct as follows

> "The problem for Carr is that she was not merely the recipient of crude behavior and abusive language—she also dished it out. . . . In short, she contributed just as much abusive language and crude behavior as did the male tinners, and therefore was just as responsible for any hostile sexual environment that consequently arose."

Mem. op. at 31 (emphasis added). When testifying about Carr's foul language, *the other females* who worked in the tinshop, Rebecca Hornocker and Karen Johnson, explained that *Carr was often the instigator of the coarse sexual talk and antics.*[3]

As the court stated in *Reed,* the "language and sexually explicit jokes were used around plaintiff because of her personality rather than her sex." *Reed,* 939 F.2d at 491–92. The trial record makes it eminently clear and I am thus forced to agree that Mary Carr actively participated in foul, vulgar shop talk with a rough crowd of tinners, thus "[t]he defendants cannot be held liable for conditions created by [the plaintiff's] own action and conduct." *Reed,* 939 F.2d at 492 (quoting lower court opinion).

In regard to Carr's active participation in the crude sexual behavior at the plant, the majority fails to explain the lower court's finding that *"Right after the August 1988 meeting, Carr thanked management for its efforts on her behalf, and she admitted to [Don] Stoehr that her own behavior had brought the poor shop situation about. To* the Court, this appears to be a clear recognition by Carr that she bore responsibility for her problems, and that she had been dealt with fairly by management. It does not seem to be the statement of a person who has complained continually for four years and gotten nowhere." Mem. op. at 37–38 (emphasis added). *Not only did Carr confess that "her own behavior had brought the poor shop situation about," but furthermore she admitted that GM had responded to her complaint fairly. Again, this factual finding by the trial court is entitled to great deference on review. See Concrete Pipe & Products, —— U.S. at ——, 113 S.Ct. at 2280 (stating that the clear error standard is "significantly deferential ").*

Finally, I am disturbed by the majority's apparent disregard for the district court's findings concerning General Motors' alleged failure to respond to Carr's complaints. The majority states "we are dealing here with a situation in which for more than four years one of the nation's largest enterprises found itself helpless to respond effectively to an egregious campaign of sexual harassment directed at one woman. No reasonable person could imagine that General Motors was genuinely helpless, that it did all it reasonably could have done." *Ante* at 1012. I seriously question whether the majority's argument is supported by the record, for General Motors was not aware of the alleged harassment against Carr for "more than four years." From 1984 until 1988, Carr never once entered a formal complaint about the alleged abusive treatment. In August of 1988, and again in November of 1988, less than a year before she left General Motors after being employed there for twelve years, Carr registered her initial formal complaints and GM responded immediately.[4] As we discussed

---

2. The majority seems to have put a different spin on the facts in favor of Carr. For example, the majority insists two exposures occurred during her five-year tenure at the tinshop, while the district court made a finding of only one exposure incident and even in that incident, "several tinners" testified Carr was not in a position to see anything. Mem.Op. at 9 & 30. As to the second alleged exposure incident, the court stated that no one corroborated her story. *Id.* at 9.

3. Hornocker considered Carr to be a "tramp" because of her "manner, her gestures, and the way she talked." Karen Johnson heard Carr using profanity and vulgar language in the classroom setting. Referring to Carr, Johnson testified that *"I saw that there was only a limited amount of time we could spend together without me feeling uncomfortable. . . ."* (Emphasis added).

4. It is interesting to note that she filed her EEOC complaint in July of 1989 shortly before she quit.

above, after the August 1988 complaint, Carr expressed in a letter to Don Stoehr her appreciation with the way GM handled her complaint and that she (Carr) was in part responsible for the problems in the tinshop.[5] It is rather obvious that Carr was satisfied with GM's response to her complaint in 1988 (a year before she resigned), thus her present dissatisfaction with General Motors might well be a post-event creation to avoid dismissal of her sexual harassment claim. Whatever the reason for her present allegations of GM's ineffective response, I do not believe the trial court's findings are clearly erroneous.

### CONCLUSION

Because I am of the opinion that today's holding is in conflict with *Reed*,

I DISSENT.

---

**5.** The letter is not part of the record, but both Don Stoehr and Mary testified at trial that she had sent the letter expressing her appreciation with GM's response to her complaint.