46 F.3d 1133
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
INVEX HOLDINGS, N.V., a Netherlands Antilles corporation,
Plaintiff-Appellee,
v.
FREEPORT-STERLING ASSOCIATES LIMITED PARTNERSHIP, an
Illinois limited partnership, HANOVER STERLING, an
Illinois corporation, HANOVER FREEPORT,
an Illinois corporation, et
al. Defendants-Appellants.
 No. 94-1581.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 16, 1994.
Decided Feb. 3, 1995.
 
 Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Freeport-Sterling Associates and its co-defendants appeal a judgment of foreclosure on two notes and wraparound mortgages. They allege that no default had occurred on the two notes and associated mortgages, and, consequently, no foreclosure was appropriate. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 On December 31, 1984, Invex Holdings, N.V. ("Invex") purchased certain secured debentures from National Mortgage Realty Corp. ("NMRC"). These instruments, for which Invex paid $450,000, promised to yield $4,532,849 in ten years. These debentures were collateralized with various notes and mortgages, two of which, representing $4,000,000 in wraparound notes,[1] form the basis of this appeal.
 
 
 4
 The following transactions are at the foundation of the dispute. In 1981, a developer (Jacobs-Kahan Associates, Inc.) began construction of two shopping centers, one in Freeport and the other in Sterling, Illinois. DHC Realty Corp. ("DHC"), which promotes real estate investments, formed a limited partnership ("Freeport-Sterling") in order to purchase these shopping centers from Jacobs-Kahan.
 
 
 5
 DHC, acting as general partner on behalf of the limited partnership that it had created, Freeport-Sterling, purchased both shopping centers on December 31, 1981. It paid Kahn $1.5 million and also gave it two notes and two mortgages that wrapped around the already existing primary mortgage. The wraparound mortgage for the Sterling property was $2.6 million; the wraparound for the Freeport property was $1.4 million. The $4 million encompassed by these wraparound mortgages represented the amount of the original loan used to begin construction, and the estimated profit Jacobs-Kahan expected to earn once it finished construction and leasing of the two properties. In return for the cash, notes and mortgage, Freeport-Sterling, upon completion of the shopping centers, expected an annual return of $135,000.
 
 
 6
 Provisions were made in each note to adjust the face amounts of the notes upward or downward based on the financial performance of the shopping centers. The provisions stated that October 1, 1982, nine months after the property purchase, would be the "earn out date." At that time, which coincided with the projected completion date for the construction and the leasing of the shopping centers, it would be determined whether the net rental return to Freeport-Sterling equalled, exceeded or fell short of the $135,000 annual return target. If the return equalled or exceeded the target, the notes and mortgages would "lock-in" at their face value, and Jacobs-Kahan would then secure its profit. If the annual return was less, pursuant to a complicated formula,[2] Freeport-Sterling could calculate the amount by which the mortgage was to be reduced. If the annual rental return was only nominal, it was possible under the formula to reduce the entire indebtedness to the underlying mortgage on each property.
 
 
 7
 On October 1, 1982, the "earn out date," Jacobs-Kahan had not finished construction or lease of the property. Freeport-Sterling and DHC therefore chose not to adjust the face amount of the notes to reduce or even to eliminate the mortgages. Rather, DHC and Freeport-Sterling extended the "earn out date" by 180 days to April 1, 1983, as permitted by the terms of the notes. No further provision for any additional extensions of the "earn out date" existed in the notes.[3]
 
 
 8
 By December of 1982, Jacobs-Kahan was financially troubled. DHC and its limited partners became concerned that a bankruptcy would adversely impact Freeport-Sterling. Therefore, on December 15, 1982, DHC took assignment of the two wraparound notes and mortgages from Jacobs-Kahan and released Jacobs-Kahan from further obligations. DHC and Freeport-Sterling chose this course rather than canceling the notes and mortgages and acquiring the shopping centers for its original investment of $1.5 million plus the indebtedness of the first original mortgages.
 
 
 9
 The assignment created an unusual legal and business relationship. The obligor of the notes, the limited partnership, Freeport-Sterling, now was required to make interest payments on the $4 million wraparound mortgages to its own general partner, DHC. Freeport-Sterling made this choice in order to preserve the tax benefits of the limited partners by allowing Freeport-Sterling to show substantial indebtedness. Further, even though DHC also took over the Jacobs-Kahan obligation to complete construction and leasing, Freeport-Sterling was permitted to cease paying monthly interest on the wraparound notes. The general partner, DHC, was intent on continuing to make the transaction beneficial for the limited partners. The payments on the underlying mortgages on the property were kept current, however, at least through December 31, 1993.
 
 
 10
 The extended "earn out date" passed without any action being taken. Accordingly, the face amounts of the $4 million in notes were never altered to reflect the reduced amount of the indebtedness--reduced because Freeport-Sterling had not been required to make interest payments to the obligee, the general partner, DHC. This situation continued unchanged until late 1984.
 
 
 11
 On December 28, 1984, DHC assigned, for minimal consideration, its rights under the notes and mortgages to NMRC. NMRC was DHC's sister corporation. It was owned by the same parent company, Diversified Holdings, and controlled by a partner of the president of DHC. This transaction only substituted NMRC as obligee for DHC; no other aspect of the notes and mortgages were affected.
 
 
 12
 On December 31, 1984, NMRC sold debentures to Invex. The notes and mortgages were to serve as security for the debentures. The debentures later proved to be worthless. Invex then obtained a judgment against NMRC and instituted foreclosure proceedings with respect to the mortgages--the collateral for the debentures.
 
 B. District Court Proceedings
 
 13
 Invex brought an action for a simple foreclosure on the two mortgages held by Freeport-Sterling. The cause of action was premised on 735 ILCS 5/15-1501 et. seq., the Judicial Foreclosure section of the Illinois Mortgage Foreclosure Act. Freeport-Sterling took the position that no default had occurred because the underlying mortgages had been kept current. It also contended that Invex had the burden of proving that default on the wraparound mortgages had occurred.
 
 
 14
 The district court found that DHC and Freeport-Sterling had not exercised their right to reduce or even cancel the notes and mortgages. When the notes and mortgages were transferred to Invex, they were not subject to any conditions precedent because the "earn out dates"--the point at which the mortgages and notes could have been changed--had passed. The district court viewed the case as a simple foreclosure. Invex had ownership of notes which had never been paid for almost ten years; the unpaid interest on the notes was in excess of $600,000.
 
 
 15
 The district court concluded that the defendant had the burden to prove that no default occurred on the two mortgages. The court then stated that the defendants had been unable to demonstrate "that there was ever a reduction of the principal amounts owed under the notes." (Tr. 131). Rather, DHC and Freeport-Sterling maintained the principal amounts due in order to take advantage of valuable tax losses. The district court held that DHC assigned the notes and mortgages to a sister company instead of canceling them, and Invex acquired the notes and mortgages without any notice that the right to reduce the amounts had been exercised. The district court concluded that, in fact, that right never had been exercised. Accordingly, the district court concluded that Invex was entitled to recover on the notes at their $4,000,000 face value.
 
 II
 DISCUSSION
 
 16
 The appellants ask that we review the district court's findings of fact. In asking that we undertake this scrutiny, the appellants assume a great burden. We shall not set aside the findings of the district court unless they are clearly erroneous. Fed.R.Civ.P. 52(a); see Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). "Our scrutiny of the district judge's findings of fact thus is deferential." Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1008 (7th Cir.1994).
 
 
 17
 We cannot say that the district court erred in concluding that the defendants failed to establish a reduction of the principal amounts owed under the notes. Under section 5/2-613(d) of the Illinois Code of Civil Procedure, defendants are required to prove any defense or any other affirmative matter that seeks to avoid the legal effect of, or defend against, the foreclosure action at issue. See Foreman Trust & Sav. Bank v. Cohn, 174 N.E. 419, 422 (Ill.1930); Niehaus v. Niehaus, 120 N.E.2d 66, 70 (Ill.App.Ct.1954). The district court correctly concluded that Freeport-Sterling only succeeded in establishing that, for a two-year period, it had the right to reduce or cancel the notes and the wraparound mortgages that secured them. Mr. Pivnick, former president of DHC, and sole witness for Freeport-Sterling testified that "[h]ad we kept [the earn out] date intact, the entire amount of the wrap position of the seller would have been wiped out. (Tr. 54). Further, he stated, "[w]e suggested, proposed to the limited partners that they had a choice--we could reduce the mortgages in the fall of 1982 down to the underlyings or we could attempt to keep the partnership intact in relation to the original projections of cash flow and tax benefits." (Tr. 54). Freeport-Sterling and DHC chose to maintain the face value of the notes in order to take advantage of the tax deduction benefits.
 
 
 18
 Q Reducing the cost of that asset would have had adverse tax consequences to the investors, wouldn't it?
 
 
 19
 A Yes.
 
 
 20
 Q And, therefore, the asset was not reduced, that is to say, the note was not written down on purpose, correct?
 
 
 21
 A The tax considerations was one of the reasons why.
 
 
 22
 Q It wasn't some accident, was it?
 
 
 23
 A What--
 
 
 24
 Q It being the decision not to exercise the right to reduce the face amount, that was a willful decision, wasn't it?
 
 
 25
 A The decision not to write it down was a decision based on tax consequence.
 
 
 26
 ...
 
 
 27
 Q And that gave the limited partnership the right to reduce the face amount of those notes in accordance with their terms, didn't it?
 
 
 28
 A Yes.
 
 
 29
 Q And they didn't do so, did they?
 
 
 30
 A No.
 
 
 31
 The record therefore supports the decision of the district court that the calculations required in the notes at the earn out dates were never used to reduce the face amount of the notes. (Tr. 54-55, 72-78, 91). If the notes had contained an automatic provision for the reduction of the principal, the notes would have been written down automatically on the extended earn out date. Freeport-Sterling thus would have become the owner of the shopping center properties for their initial $1.5 million outlay plus the value of the original underlying mortgages. The district court concluded, however, that the notes did not automatically provide for reduction of the principal face amount. We have no quarrel with that conclusion.
 
 
 32
 The district court correctly concluded that Freeport-Sterling was not excused of its obligation under the notes to pay interest on the wraparound mortgages. It did not pay such interest while DHC and its sister corporation NMRC were obligees under the notes. (Tr. 86-87, 90, 92-95). However, when the notes and mortgages were assigned to Invex, they were transferred at their original principal face value amounts and Invex had the right to conclude that the original terms would be respected. The record shows, the district court found, that Freeport-Sterling, in conjunction with its general partner DHC, did not write down the face amount and thus left the principal face value of the notes and mortgages undisturbed in order to take advantage of the tax consequences. Those unadjusted notes were assigned for value to Invex in conjunction with a debenture purchase. The district court therefore correctly entered judgment on behalf of Invex.
 
 
 33
 Accordingly, the judgment of the district court is affirmed.
 
 
 34
 IT IS SO ORDERED.
 
 
 
 [1]
 A Wraparound Mortgage is defined as: A second mortgage which wraps around or exists in addition to a first or other mortgages. Form of secondary financing typically used on [ ] properties having first mortgages ... in which a lender assumes the developer's first mortgage obligation and also loans additional money, taking back from developer a junior mortgage in total amount. Black's Law Dictionary 1441 (5th ed. 1979)
 
 
 [2]
 See Appellant's Br., App., Ex. 1 para. 25, Ex. 4 para. 25
 
 
 [3]
 There is confusion in the record with respect to the earn out date. According to an exhibit marked at trial as Exhibit 30, DHC and Freeport-Sterling entered into an agreement which provided that the earn out date would be extended two years to September 1, 1984. However, because DHC was still the obligee under the notes at this 1984 date, the conclusions of the district court are not affected by any possible error