Shelley A. ZORN, Plaintiff,

v.

HELENE CURTIS, INC. and William C. Decker, Defendants.

No. 93 C 5272.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 29, 1995.

Richard Lee Stavins, Robbins, Salomon & Patt, Ltd., Chicago, IL, for Shelley A. Zorn.

Richard Elliot Lieberman, Gail Chaney Kalinich, Neil G. Wolf, Ross & Hardies, P.C., Chicago, IL, for Helene Curtis, Inc., William C. Decker.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Shelley Zorn ("Zorn") brings this action against the defendants, Helene Curtis, Inc. ("Helene Curtis"), and William C. Decker ("Decker"), alleging sexual discrimination, sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a) and 2000e–3(a) (1983 & Supp.1995) (Counts I and II).[1] Invoking the Court's supplemental jurisdiction, Zorn also asserts the state law claim of intentional infliction of emotional distress (Count III). Helene Curtis and Decker move for summary judgment on all counts. The defendants' motion for summary judgment is presently before the Court.

## I. BACKGROUND

The following undisputed facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits. Unfortunately, this case presents an example of the problems that arise when parties fail to properly comply with Local Rule 12. *See Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir. 1994) (noting that recent cases exhibit problems with adherence to the requirements of

---

1. It is not clear whether or not Zorn has sued Decker as an individual under Title VII. Zorn's complaint expressly limits Counts I and II as being "Against Helene Curtis," giving the impression that Zorn only sought to sue Helene Curtis, and not Decker, for Title VII violations. However, Zorn subsequently indicated that Deck-er was also alleged to have violated Title VII. Pl.'s Mem. In Opp'n. at 47. Moreover, the defendants addressed the issue. *See* Def.'s Mem. In Supp. Of Summ.J. at 12 n. 13; Def.'s Reply Mem. at 14. This Court will treat the matter as if Decker was in fact a defendant under Counts I and II.

Local Rule 12). As such, a few words about Local General Rule 12 are warranted.

Pursuant to Local Rule 12(M), the defendants filed a brief statement of undisputed facts supported by citations to depositions, transcripts of which were supplied to the Court.[2] In response, the plaintiff filed, in accordance with Local Rule 12(N)(3)(b), a response to the defendant's statement[3] as well as a statement of "additional facts that require the denial of summary judgment"[4] (the defendant subsequently filed a corresponding response).[5] However, in her 12(N) statement, the plaintiff cited to deposition testimony but failed to attach deposition transcripts—pages of which the Court has never seen. Thus, the Court is unable to verify the veracity of the evidence referred to by the plaintiff.

■■■ Equally problematic is the fact that, in a number of instances, the plaintiff disputed portions of the defendants' 12(M) statement but failed to provide any references for the Court. Local Rule 12(N) requires "specific references to affidavits,[6] parts of the record, and other supporting materials" that allegedly establish a factual dispute. The Court is not obligated to scour the record in search of a factual dispute. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994). The mere denial of a particular fact without specific references to supporting material that allegedly establish a factual dispute is insufficient;

and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. *Flaherty*, 31 F.3d at 453. The Court may adopt and strictly enforce the local rules, deeming all factual allegations not properly controverted as being admitted. *Id.; Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). The Court shall do so in this case. This case—with 14 voluminous depositions; a 38–page, 169 paragraph affidavit; a 5–page, 23 paragraph 12(M) statement; a 37–page, 158 paragraph statement of additional facts; and a 24–page, 37 paragraph complaint (not to mention all the accompanying answers and responses)—aptly illustrates the need for rules such as Local General Rule 12 that are designed to streamline the resolution of summary judgment, in part by having the parties highlight the relevant evidence. *See Waldridge*, 24 F.3d at 922–23 (discussing the purposes of Local Rule 12 and other similar rules from other districts). Therefore, in those instances where Zorn does not adduce evidence to properly controvert Helene Curtis' well-supported factual assertions, the facts averred will be admitted. That said, we turn now to the facts of this case.

Helene Curtis is a leading international manufacturer of hair care products. Def.'s Facts ¶ 2. Helene Curtis hired Zorn in July of 1990 as the "National Education Manager" for the "Attractions" product line. *Id.* Zorn remained in this capacity until she suffered a

---

2. Helene Curtis' statement shall be cited as "Def.'s Facts ¶__."

3. Zorn's response shall be cited as "Pl.'s Facts ¶__."

4. Zorn's additional facts shall be cited as "Pl.'s Add'l Facts ¶__."

5. Helene Curtis' response shall be cited as "Def.'s Resp. Add'l Facts ¶__."

6. Throughout her 12(N) statement, the plaintiff refers to her affidavit. This affidavit often contradicts the plaintiff's own earlier deposition testimony in what appears to be an attempt to retract or explain away earlier statements. It is well-settled in this circuit that a party cannot "'thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions.'" *Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994) (quoting

*Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1105 (7th Cir.1985)); *accord Russell v. Acme–Evans Co., ADM*, 51 F.3d 64, 67–68 (7th Cir.1995); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861–61 (7th Cir.1985). Where depositions and affidavits conflict, the affidavit is to be disregarded unless it is demonstrable that the deposition testimony was mistaken. *Russell*, 51 F.3d at 67–68. Similarly, a statement in an affidavit that is highly unlikely considering the earlier testimony, *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1210 (7th Cir.1993), and an affidavit consisting of "bald assertions, entirely lacking in any recounting of specific facts such as required by Fed.R.Civ.P. 56(e) ...," *Babrocky*, 773 F.2d at 861, cannot be used to create a conflict with deposition testimony in the hopes of creating a triable issue of fact. *Id.* The portions of plaintiff's statement of additional facts that rely solely on improper affidavit statements, therefore, will not be considered (unless, of course, the defendant admitted the statement).

psychological breakdown and was hospitalized on August 31, 1992. Compl. ¶ 30, 31; Pl.s Add'l Facts ¶ 139–143. Zorn never returned to work after September 1, 1992. Def.'s Resp. Add'l Facts ¶ 151. While employed with Helene Curtis, Zorn had nationwide management responsibilities. Def.'s Facts ¶ 2. Her job duties entailed development and management of education and training programs to promote the Attractions product line at Helene Curtis. *Id.* ¶ 4. In order to carry out her responsibilities, Zorn was assigned a staff of five regional education supervisors. *Id.* At the time she was hired, Zorn reported directly to Decker, who was the General Manager of Attractions. *Id.* at ¶ 5. Decker was also Zorn's immediate supervisor. Pl.'s Add'l Facts ¶ 67; Compl. ¶ 9. Decker made the decision to hire Zorn. Decker Dep. at 20.

Other Helene Curtis employees who reported to Decker were Glenn Green, National Sales Manager for Attractions, and William Baldwin, Marketing Manager for Attractions. Def.'s Facts ¶ 5. Other people working for Helene Curtis during the time period relevant to this case include: Ted Niess, a Regional Manager; James Marino, President of Helene Curtis' Professional Division; Andy Biazis, National Sales Manager for Helene Curtis' ISO division; William Davis, a Regional Sales Manager with Attractions; and Tom Ridgeway, a General Manager with Helene Curtis. Pl.'s Add'l Facts ¶¶ 6–10, 85. Peter Franelli ("Xenon"), an independent contractor, demonstrated the use of Attractions' products at various choreographed shows. Def.'s Facts ¶ 19.[7]

During her tenure with Helene Curtis, Zorn received two performance reviews: in July, 1991, she was given a 4 out of 5 (above average), and in July, 1992 she received a 3 out of 5 (average). *Id.* at ¶ 6. During this same time period, Green and Baldwin were rated comparably—Green received ratings of 3 and 4 while Baldwin received ratings of 3 and 3+ +. *Id.* at ¶ 7. Zorn's salary was increased each time her performance was reviewed, and she maintained the same title and grade level throughout her employment. *Id.* at ¶ 8.[8]

The Attractions division of Helene Curtis struggled financially. *Id.* at ¶ 9; Pl.'s Add'l Facts ¶ 111. In February, 1992, the Attractions division was downsized, and jobs were eliminated in Zorn's division as well as in Green's division. Zorn Dep. at 166–170. Subsequently, in April or May 1992, Zorn began reporting to Green instead of Decker. Zorn Dep. at 203. It was explained to Zorn that the Attractions department was being reorganized, which included having her report directly to sales (Green) rather than directly to Decker. *Id.* Zorn's salary was not decreased, and her job title of national sales manager remained the same. Zorn Dep. at 194.[9] This reorganization did, however, mean an increase in job responsibilities for Zorn, as Zorn assumed responsibility for coordinating Attractions' shows.[10] Def.'s Facts ¶ 11; Zorn Dep. at 174.

Zorn charges that throughout her tenure at Helene Curtis she was discriminated against because of her gender and was forced

---

**7.** The defendant stated that "Xenon, an independent contractor, demonstrated the use of Attractions products...." Def.'s Facts ¶ 19. The plaintiff responded: "DENIED: Xenon was the agent of Helene Curtis...." Pl.'s Facts ¶ 19. No references to the record were supplied by the plaintiff that would establish a factual dispute. Moreover, we note that at her deposition and in her complaint, Zorn stated that Xenon was an independent contractor. Compl. ¶ 13; Zorn Dep. at 741. Therefore, the Court will deem the fact admitted that Xenon was an independent contractor who performed the functions listed in the defendant's 12(M) statement.

**8.** In her 12(N) statement, Zorn responded: "DENIED IN PAR: The accounting department budgeted plaintiff for a 5.5% raise in 1992, and she

received only a 3% raise." Pl.'s Resp. ¶ 8. This does nothing to controvert Helene Curtis' statement that Zorn received a raise after each performance review. We will treat this as an admission that she did in fact receive a raise after each performance review.

**9.** In her affidavit, Zorn claims that her job title became a "free-for-all." Aff. ¶ 162. However, as previously noted, she cannot attempt to create a genuine issue of material fact by submitting an affidavit contradicting her earlier deposition. *See infra* note 6. As a result, the affidavit will be discounted on this point.

**10.** Shows are choreographed presentations in which hair stylists demonstrate the use of hair products. Def.'s Facts ¶ 12.

to work in a hostile work environment replete with offensive sexual comments and conduct. Zorn Aff. ¶¶ 14, 15. According to Zorn, the hostile work environment was permitted, encouraged and often created by Marino, Decker, Baldwin and Green. Pl.'s Add'l Facts ¶ 15. In addition, Zorn charges that much of the conduct was designed to force her to quit. Compl. ¶ 26; Pl.'s Add'l Facts ¶¶ 88, 130, 134. Zorn claims that the discriminatory treatment and the sexual harassment to which she was constantly subjected created unbearable stress, causing her to suffer a nervous and mental breakdown in late August, 1992. Pl.'s Facts ¶ 143. She also lost sleep, lost weight and had trouble eating. *Id.* ¶ 99. Her relationship with her husband soured, leading to a separation. *Id.* ¶ 154. Zorn charges that she continues to suffer from severe depression, sleeplessness, anxiety and moodiness. *Id.* ¶ 153. As a result, she cannot work, has trouble concentrating, and lost all credibility in the hair care industry. *Id.* ¶ 153, 155. There is no dispute that Zorn developed suicidal ideations and was diagnosed as suffering from severe depression. Def.'s Resp. Add'l Facts ¶¶ 139–142, 147, 150. Zorn claims that the discriminatory and harassing environment caused her mental breakdown, forcing her out of work involuntarily—in other words, she claims that she was constructively discharged. *Id.* ¶ 156.

Zorn contends that a litany of continuous offensive remarks and discriminatory treatment pervaded the work place at Helene Curtis throughout her tenure. As examples of the hostile environment, Zorn claims that the following incidents, among others, occurred: (1) during a cocktail party where an important distributor was present, Xenon brought Zorn to the front of the room, pointed to Zorn and said "look at this one, she has got legs," Zorn Dep. at 854; (2) at business meetings and dinners, Decker, Baldwin, and Green discussed sex and the female anatomy of the women present and women in general, Pl.'s Add'l Facts ¶ 15; (3) Decker frequently grabbed his crotch in front of Zorn, *Id.* ¶ 27; (4) Decker, Green and Baldwin constantly commented on the female anatomy, female weight, and how a woman filled out her dress or blouse, Pl.'s Facts ¶ 28; (5) Decker,

Green, Baldwin and Niess used profanity and referred to women as "sluts" or "bitches," Pl.'s Facts ¶¶ 29, 30; (6) Green made comments about Zorn's chest size, including once at a trade show in Jackson, Mississippi, when Zorn was wearing a bathing suit with a robe over it, Pl.'s Facts ¶¶ 31, 33; (7) in the presence of Decker, Baldwin, Green and other employees, Niess showed Zorn a page of a *Victoria's Secret* catalog featuring a model in provocative lingerie and told Zorn "I can picture you in that," Zorn Dep. at 746–47; (8) in Zorn's presence, Green and Baldwin commented on the chest sizes of various female employees, discussed whether a certain female employee was wearing a "bra" and would discuss what it would be like to have sex with various female employees, Pl.'s Add'l Facts ¶¶ 34–35; (9) Decker discussed the sex life of another female employee with Zorn, *Id.* ¶ 36; (10) in 1990, as they were walking in Chicago, Baldwin commented on the size of Zorn's buttocks and "girth," Zorn Dep. at 744; (11) at a meeting in Las Vegas in 1991, Xenon asked Zorn "do you spread your legs for anyone other than your husband?" Pl.'s Add'l Facts ¶ 40; (12) Decker, Baldwin, Xenon and Niess made comments about Zorn's attire, hairstyle, and femininity, telling her what she should wear, how she should cut her hair, and that she should act more feminine and look sexier, *Id.* ¶¶ 41, 42, 44, 60, 61, 62; (13) Decker would yell at Zorn for not being feminine enough or for being too matronly, *Id.* ¶ 47; (14) Zorn was told that if she were a male employee she would be complemented, but because she was a female she was called a "bitch," *Id.* ¶ 43; Zorn Dep. at 136; (15) Marino gave a speech to all middle and upper level management personnel at Helene Curtis, including Zorn, in which he said that all management level women with Helene Curtis should wear their hair in a perm, singling out one particular employee as an example, Pl.'s Add'l Facts ¶ 63; (16) Decker gave Zorn tubes of hair coloring that he wanted her to use, Pl.'s Add'l Facts ¶ 61; (17) Decker winked at Zorn (the winking occurred less than ten times between July 1990 and April 1992), Def.'s Resp. Add'l Facts at ¶ 45; (18) Decker, Baldwin and Green told Zorn to wear a shorter hemline on her skirts and dresses and, when

she did so, Decker commented: "We are finally seeing some leg," Pl.'s Add'l Facts ¶ 65; (19) Xenon would leave Zorn voice mail messages telling her to get a new personality and calling her a "female bitch," *Id.* ¶¶ 75, 77; and (20) at a 1991 meeting in Las Vegas, Decker told Zorn "I know for a fact that you don't look like that when you wake up in the morning," Pl.'s Add'l Facts ¶ 39.

In addition to her complaints about the sexual overtures that permeated the workplace, Zorn charges that she was treated differently and less favorably than male employees in other respects. For example, (1) Decker frequently yelled at Zorn, did not speak civilly to her and would berate her when she reported business problems, Pl.'s Add'l Facts ¶¶ 47, 48, 49, 80; (2) Decker would not allow Zorn to attend important business meetings, other business functions, and many work related social events including a trade show in Las Vegas in August, 1992, at which new distributors were present, *Id.* ¶¶ 70, 78, 86, 105–06, 108–09, 131; (3) Zorn was instructed to arrive early in order to save desirable tables for Decker at a trade show in August, 1992, *Id.* ¶ 107; (4) at a Las Vegas meeting, Zorn was told to check the men into the hotel and to clean up after every meeting session; *Id.* ¶ 110; (5) Decker would repeatedly ask Zorn to sit or stand next to him at business functions so that they could be close, *Id.* ¶¶ 55, 58; (6) Decker gave Zorn unbearable work loads, often without giving her any training or assistance, *Id.* ¶¶ 71, 74, 96; (7) in March, 1992, at a show in Oak Brook, Baldwin and Decker went off for lunch, leaving Zorn to work at the booth by herself, *Id.* ¶ 81; (8) Zorn had to give a detailed accounting of her time whenever she arrived late or left early while Baldwin and Green were never even criticized for arriving late or leaving early, *Id.* ¶ 92; (9) in 1992, Decker told Zorn that she had to clean up the supply room, which was a janitorial function, despite the fact that Zorn held a management level position, *Id.* ¶ 98; (10) Zorn asked Decker why he treated her differently and why he humiliated her only to be told that she needed to be more feminine and show more emotion, *Id.* ¶ 129; (11) Zorn was not provided information presented at regional sales meetings, *Id.* ¶ 127, 131; (12) on a business flight to Phoenix in August, 1992, Decker, Baldwin and Green flew in first class while Zorn was seated in coach, *Id.* ¶ 123; (13) in July, 1992, Green gave Zorn an employee review of 3 (average) and said, "Shelly, if I were you I would quit," Zorn Dep. at 851; Pl.'s Add'l Facts ¶ 102; (14) and, in what Zorn characterized as "the final straw," Zorn was threatened with the loss of her job and offered no assistance (despite the fact that she had been awake for 24 hours doing work for Helene Curtis) when a cargo shipment consisting of five containers weighing over 500 pounds each that was supposed to arrive at a trade show in Phoenix in August, 1992, was misdirected by the carrier to Los Angeles, Pl.'s Add'l Facts ¶¶ 133–36.

Amidst all these alleged incidents by Helen Curtis, Zorn admits that she also at times engaged in inappropriate behavior. For instance, she wrote a note to Baldwin that said "roses are red, violets are blue, you're 35 and a real stud too." Pl.'s Facts ¶ 20. At a management meeting that ran from May 31 through June 2, 1992, Zorn kissed the shirt collar of Steve Smith, vice president of Helene Curtis' Professional Division, leaving a lipstick mark. *Id.* ¶ 21. At a company party, Zorn passed raspberries and whipped cream from her mouth to the mouth of Pat Ratcliffe, another Helene Curtis employee. *Id.* ¶ 22. And at a meeting in May, 1992, in what Zorn characterizes as an attempt "to be one of the boys," she touched Bill Larkin, an Attractions regional sales manager, near the crotch area of his pants (it is disputed as to whether she actually grabbed his genitals or not). *Id.* ¶ 17. Zorn claims that she was slightly intoxicated at this meeting. *Id.*

Zorn claims that she complained about the unfavorable situation to Anna Marie Buchman (a private psychologist not associated with Helene Curtis), Ridgeway and Decker. Pl.'s Add'l Facts ¶¶ 83–85, 87. Zorn charges that as a direct result of these complaints she was demoted, Pl.'s Add'l Facts ¶ 87, and Baldwin, Green and Decker began a campaign designed to make life for her intolerable at Helene Curtis. *Id.* ¶ 88. This campaign consisted of, among other things, harassing memos falsely accusing Zorn of tardiness, telling Zorn that she should quit, falsely

accusing her of missing work deadlines, and criticizing her management technique and her reports. *Id.*

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Materiality[11] is determined by assessing whether the fact in dispute, if proven, would satisfy a legal element under the theory alleged or otherwise affect the outcome of the case. *Id.* at 247, 106 S.Ct. at 2509. The Court must view all the evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers., Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the non-movant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgement may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the Court's sole function is to determine "whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994). Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477

U.S. at 255, 106 S.Ct. at 2513–14. In an employment discrimination suit, where credibility and intent are crucial issues, these standards are applied with added rigor. *Courtney v. Biosound*, 42 F.3d 414, 418 (7th Cir.1994).

## III. ANALYSIS

### A. Title VII Standards

#### 1. Sexual Discrimination

Zorn's ultimate burden with respect to her Title VII claim for sex discrimination is to establish that Helene Curtis intentionally discriminated against her on the basis of her gender. Zorn may satisfy this burden in one of two ways: (1) she may adduce direct evidence of discrimination, or (2) she may present circumstantial evidence of discrimination, resorting to the indirect, burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Zorn has not presented any direct evidence of discrimination, and, therefore, must resort to the burden-shifting method of proof.

Under the burden-shifting approach, the plaintiff may establish a prima facie case of discrimination by demonstrating the following four points: (1) she is a member of a protected class; (2) she is eligible for the position in question; (3) she suffered an adverse employment action; and (4) the employer treated others similarly situated more favorably. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Heerdink v. Amoco Oil Co.*, 919 F.2d 1256, 1259 (7th Cir.1990), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991). The plaintiff's initial burden in satisfying "[t]hese four prongs present[s] a low hurdle...." *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994). If the plaintiff succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimi-

---

11. "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 247, 106 S.Ct. at 2509. Factual disputes that are irrelevant or unnecessary are not material. *Id.*

nation arises and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory justification for its action. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994). If the defendant articulates such a justification, the burden shifts back to the plaintiff to prove that the proffered reasons are a pretext. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. In other words, the plaintiff must prove that the offered reason is not the true reason for the employment action. *Id.* Pretext may be shown by establishing one of the following: (1) the defendant's explanation had no basis in fact, or (2) the explanation was not the "real" reason, or (3) the reason stated was insufficient to warrant the adverse employment action. *Hughes*, 20 F.3d at 746. The plaintiff always retains the ultimate burden that she was the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

### 2. Sexual Harassment

The Supreme Court has held that Title VII is not limited to economic discrimination, but rather Title VII "strike[s] at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). More recently, the Court has reaffirmed that sexual harassment in the workplace violates "Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993); *see also Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 (7th Cir.1994). Allowing sexual harassment to be actionable under Title VII "protect[s] working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995).

The Supreme Court in *Meritor* made clear that two types of sexual harassment may be actionable under Title VII. 477 U.S. at 64–65, 106 S.Ct. at 2404. The first is where the sexual misconduct is "directly linked to the grant or denial of an economic quid pro quo." *Id.* at 65, 106 S.Ct. at 2404. Zorn has not advanced a quid pro quo theory, and the Court notes that there is nothing in the record that would support such a theory. The second type of actionable sexual harassment is where "the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.* Zorn bases her claim on a "hostile work environment" theory of recovery.

There are two questions that must be asked in a claim based on a hostile work environment. *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994). The first (which, as will be seen, is itself a two-part question) is whether the plaintiff was, because of her sex,[12] subjected to such hostile, intimidating or degrading behavior, verbal or nonverbal, as to adversely affect the conditions under which she worked. *Id.* Not all conduct that has sexual overtones can be characterized as sexual harassment in violation of Title VII. *R.R. Donnelley*, 42 F.3d at 443. Rather, it is only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' [that] Title VII is violated." *Harris*, —— U.S. at ——, 114 S.Ct. at 370 (quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. at 2404–05); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). Moreover, the conduct in question must be judged by both an objective and a subjective standard. *Harris*, —— U.S. at ——, 114 S.Ct. at 370. As the Supreme Court observed:

**12.** We do not imply that only women may bring sexual harassment claims. "Sexual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995).

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Harris,* —— U.S. at ——, 114 S.Ct. at 370. This Court, therefore, must consider not only the actual effect of the alleged harasser's conduct on the victim, but also the effect similar conduct would have had on a reasonable person in the plaintiff's position. *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir.1993).[13]

■■■■ Determining whether an environment is "hostile" is not, and cannot be, a mathematically precise test. *Harris,* —— U.S. at ——, 114 S.Ct. at 371.[14] In order to make that determination, the Court must look at all the circumstances, including the frequency of the discriminatory conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating; and whether the conduct unreasonably interferes with the employee's performance. *Id.* The absence or presence of psychological harm is relevant to determining whether the plaintiff actually found the environment hostile or abusive; however, no single factor is required. *Id.*

■■■■ The inquiry does not end at that point. A second question must be asked. That second question is, if the Court finds a hostile environment in violation of Title VII, then was the defendant's response (or lack thereof) negligent. *Saxton,* 10 F.3d at 535–36; *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990). "It would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee." *Carr,* 32 F.3d at 1009. For that reason, the employer is liable only if it knew or should have known of the employees' acts and, despite that knowledge, failed to take appropriate remedial action. *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 320 (7th Cir.1992). The employer's liability is determined by the application of the common-law rules of agency. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408; *R.R. Donnelley,* 42 F.3d at 446. With these standards in mind, we now turn to the merits of Zorn's allegations.

### B. Decker's Motion for Summary Judgment

■■■ Zorn's complaint includes an allegation that Decker is individually liable under Title VII (Counts I and II). Decker moved for summary judgment as to Counts I and II, arguing that under Title VII he may not be held individually liable for Title VII violations. Decker is correct as a matter of law.

The Seventh Circuit recently held that "individuals who do not otherwise meet the statutory definition of 'employer' cannot be

13. The Seventh Circuit has had occasion to discuss the objective and subjective prongs outlined by the Supreme Court in *Harris.* With respect to the subjective component, the statutory protections of Title VII encompass the employee who has the dedication and fortitude to complete all assigned tasks even in the face of offensive and abusive sexual behavior. *R.R. Donnelley,* 42 F.3d at 444; *Dey,* 28 F.3d at 1454. The subjective standard asks not what a reasonable person might be capable of enduring, but rather it asks whether the offensive acts alter the conditions of employment. *R.R. Donnelley,* 42 F.3d at 444. In evaluating the subjective component, we note that Seventh Circuit case law is replete with instances in which isolated and "innocuous" incidents fell short of establishing a hostile work environment claim. *See R.R. Donnelley,* 42 F.3d at 443, n. 2 (listing cases and describing the facts involved). However, even isolated instances

must be evaluated cumulatively in order to allow the court a realistic view of the work environment. *Id.* at 443, n. 3 (listing cases and describing the facts involved).

14. The courts have had difficulty in drawing the line between what is and what is not actionable sexual harassment is a difficult task. The Seventh Circuit explained:

On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.
*Baskerville,* 50 F.3d at 430–31 (citations omitted).

liable under the ADA." *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1282 (7th Cir.1995).[15] Although that holding applied to the ADA, the court noted that the decision "obviously affects the resolution of the very similar question under Title VII. . . ." *Id.,* n. 10. Subsequently, this Court has held that because the ADA and Title VII define "employer" in a materially identical manner, the holding in *AIC Security* mandates the same result in a suit brought under Title VII. *Lynam v. Foot First Podiatry Ctrs.,* 886 F.Supp. 1443, 1445–48 (N.D.Ill.1995). This Court has previously noted and discussed its disagreement with *AIC Security, see Lynam,* 886 F.Supp. at 1445–48, and will not do so again. Suffice it to say that this Court continues to adhere to the view that Congress' intent to eradicate discrimination from the workplace is best served by recognizing individual liability under the various anti-discrimination statutes. *See Jendusa v. Cancer Treatment Ctrs. of Am.,* 868 F.Supp. 1006 (N.D.Ill.1994) (holding that individuals may be held liable for unlawful discrimination under the ADA; discussing cases under Title VII, the ADA and the ADEA). Nevertheless, we are mindful of our subordinate position as a district court and recognize that we are, of course, bound by precedent. We respectfully follow the Seventh Circuit precedent, and, accordingly, we grant defendant-Decker's motion for summary judgment on Counts I and II as directed against him in his individual capacity.

### C. Helene Curtis' Motion for Summary Judgment

As an initial matter, we must determine whose conduct and what conduct we may properly consider. We cannot consider any alleged remarks made by, or conduct of, Biazis. Zorn gave a lengthy and detailed deposition, submitted a lengthy and detailed complaint, and answered interrogatories asking her to identify any individuals with knowledge of sexual discrimination or harassment aimed at Zorn. Zorn never mentioned Biazis. We think that the naming of Biazis in Zorn's affidavit for the first time, despite the ample opportunity to identify him earlier, renders any allegation relating to Biazis sufficiently unlikely such that it should not be considered. *See Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993) (statements in an affidavit that are highly unlikely considering earlier testimony cannot be used to create a genuine issue of material fact). We also cannot consider remarks made by Xenon. By Zorn's own admission, Xenon was an independent contractor; he was not an employee of Helene Curtis.[16]

Helene Curtis argues that we should discount virtually all of Zorn's allegations because they were not specified in her EEOC charge. *See generally* Def.'s Resp. Add'l Facts. We disagree. It is true that a Title VII plaintiff must file a timely charge with the EEOC before commencing a lawsuit, 42 U.S.C. § 2000e–5(e); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974), and that the filing of an EEOC charge functions as a condition precedent to the filing of a Title VII suit. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 864 (7th Cir.1985). As a result, only those claims that are fairly encompassed within an EEOC charge can be the subject of a lawsuit in federal district court. *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1003 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). However, a Title VII complaint need not contain verbatim the same charges as were mentioned in the EEOC charge. All that is necessary for a plaintiff to proceed on a Title VII claim is that the claim be "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538

---

**15.** Decker does not otherwise meet the statutory definition of employer. *See* 42 U.S.C. § 2000e(b).

**16.** The fact that we cannot consider statements or behavior of Xenon or Biazis does not mean that we tacitly approve of their conduct. To the contrary. Zorn's allegations describe two men who at best reached their ultimate maturity and developed their sense of humor at puberty. Xenon and Biazis exhibited a total lack of proper professional behavior, not to mention simple decency. If Xenon and Biazis did what Zorn alleges, their utter lack of respect for a female professional cannot be condoned under any circumstances.

F.2d 164, 167 (7th Cir.) (en banc), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). "The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons often unschooled, to enforce its provisions." *Babrocky,* 773 F.2d at 864. In this case, Zorn's EEOC charge asserts that Decker, Green, and Baldwin "embarked on a systematic campaign of harassment." We believe that Zorn's detailed allegations are reasonably related to and grow out of this charge—Zorn's allegations simply define what she claims was a systematic campaign of harassment.

### 1. Count I: Sexual Harassment

██ Helene Curtis argues that Zorn's allegations consist of isolated and trivial remarks lacking any sexual component that do not rise to the level of hostility or pervasiveness necessary to establish a claim of a hostile work environment. Isolated or trivial remarks of a sexual nature do not constitute sexual harassment. *Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 708 (7th Cir.1995); *see, e.g., Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 535 (supervisor's inaccessibility, condescension, impatience, and teasing not harassment); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (several incidents of unwanted touching, attempted kisses, asking out on dates, calling plaintiff a "dumb blonde," and placing "I love you signs" in work area not harassment); *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 213 (7th Cir.1986) (lewd comments and slap on the posterior not harassment). We do not agree that the conduct Zorn complains of was isolated or trivial.

#### a. Subjective Viewpoint

Zorn's allegations clearly suggest a subjectively hostile work environment. She charges that offensive and often obscene sexual remarks and conduct were a pervasive aspect of her employment that persisted throughout her tenure at Helene Curtis. Pl.'s Facts ¶ 14. Although Zorn tolerated the environment for slightly over two years, she stated that the daily sexual banter offended her, humiliated her, embarrassed her and made her feel uncomfortable. *See, e.g., id.* ¶ 19, 20, 27, 30; *see also R.R. Donnelley,* 42 F.3d at 444 (stating that Title VII's protects the employee " 'who has the dedication and fortitude to complete her assigned tasks even in the face of an offensive and abusive sexual banter ...' ") (quoting *Dey,* 28 F.3d at 1454). Zorn claims that as a result of this hostile environment she lost sleep, could not eat and could not concentrate. Pl.'s Facts ¶ 153. At one point during a convention in Phoenix in 1992, Zorn was so overwhelmed that she became physically sick and began to vomit. *Id.* ¶ 139. Finally, Zorn charges that the hostile work environment caused her to have a complete mental and psychological breakdown in late August, 1992, and led to the development of severe depression complete with suicidal ideations. *Id.* ¶ 141–43. Helene Curtis asserts that Zorn's problems stem from other psychological disorders which predate Zorn's years with the defendant company, and that Zorn's reaction to the work environment were overblown because she is an overly sensitive person. Def.'s Resp. Add'l Facts ¶ 143, 149. There is some evidence to support Helene Curtis' theory, but it is too early at this juncture to say that Zorn has failed as a matter of law to establish a subjectively hostile work environment. We must draw all inferences in Zorn's favor while ruling on this motion. In so doing, we find that "there is ample evidence showing that the campaign of harassment had an impact on its target and made it more difficult for her to do her job." *Dey,* 28 F.3d at 1454 (citing *Harris,* —— U.S. at ——, 114 S.Ct. at 372 (Ginsburg, J., concurring)).

#### b. Objective Viewpoint

██ Zorn's allegations suggest that sexually offensive remarks and conduct were a constant during her years at Helene Curtis. Many of these remarks were overtly sexual, and most were directed specifically at Zorn. In the spring of 1991 in Jackson, Mississippi, Green commented that he would bet he knew how large Zorn's breasts were when Zorn was wearing a bathing suit with a robe over it. Pl.s Facts ¶ 31. In early 1990, in Chicago, Green commented to Zorn about her buttocks and her "girth." Zorn Dep. at 744. After being repeatedly told to wear shorter

skirts, Zorn raised her hemline, prompting Decker to comment that: "we are finally seeing some leg." Pl.'s Add'l Facts ¶ 65. In June, 1991, Niess told Zorn: "I can picture you in that," after showing Zorn a picture of a model in provocative lingerie. Zorn Dep. at 746–47. In addition, Decker had an unseemly "habit" of grabbing his crotch in front of Zorn. Pl.'s Add'l Facts ¶ 27. On top of all this, Zorn endured incessant comments about her femininity, clothes, hair, chest and buttocks. *Id.* ¶¶ 33, 38, 41. There were also offensive gender related comments such as the reference to women as "sluts" and "bitches," discussions about what sex would be like with certain female employees and comments on the chests of female employees. *Id.* ¶¶ 29, 35. We have no trouble concluding that the cumulative effect of these comments was extremely offensive and could be considered as such by a reasonable jury. But there's more. Other statements and conduct, not as overtly sexual, nonetheless were sexual in nature. For example, we believe that a jury could reasonably infer that comments such as Decker stating: "I know for a fact you don't look like that in the morning," and conduct such as Decker winking at Zorn and asking Zorn to sit and stand next to him, were in fact sexually offensive—especially when viewed in the context of the overall pattern of the other statements. Pl.'s Add'l Facts ¶¶ 39, 55, 58; Def.'s Resp. Add'l Facts at ¶ 45; *see Harris* at ——, 114 S.Ct. at 371 (stating that the court must consider all the circumstances). We think there is sufficient evidence in the record to corroborate Zorn's charge of ongoing sexually offensive conduct to establish a genuine issue of material fact as to whether the alleged harassment was pervasive enough to alter the terms and conditions of her employment at Helene Curtis.

Admittedly, some of Zorn's allegations are incomplete. For example, Zorn recalls that Baldwin and Green repeatedly told her to act more feminine and look sexier, although she cannot recall the specific circumstances surrounding the statements. Pl.'s Add'l Facts ¶ 61. She also asserts that Decker yelled at her for not being feminine enough or for being too matronly, but does not recall the exact circumstances. Pl.'s Add'l Facts ¶ 47. She remembers Green telling her on occasion that she did not have much of a chest, *Id.* ¶ 33, and she remembers Decker telling her about the sex life of another female employee, but cannot remember all the details. *Id.* ¶ 36. Finally, Zorn recalls on one occasion listening to Baldwin and Green talk about what it would be like to have sex with a certain full-busted female employee, but does not recall all the specifics. *Id.* ¶ 35. Zorn's case would undoubtedly be stronger if she could recall more detail about these and other incidents, but what she does recall supports her charge that the sexually offensive language and conduct was pervasive enough to create an objectively hostile or abusive work environment at Helene Curtis. It is not our duty on a motion for summary judgment to make credibility judgments or to weigh the evidence. The credibility of Zorn's allegations can only be assessed once the fact-finder hears Zorn's testimony along with all the other evidence. *Dey,* 28 F.3d at 1457 (allowing a sexual harassment claim to proceed despite the fact that many of the plaintiff's allegations were incomplete).[17]

---

17. Helene Curtis made several references to Zorn's behavior as "[t]he only conduct of an arguably sexual nature...." Def.'s Reply Mem. at 7. We do not fully understand why Helene Curtis refers to these incidents, but we do not take Helene Curtis to be implying that the conduct Zorn complained of was not unwelcome. "Of course it was unwelcome.... [This case] is different from *Reed v. Shepard*[, 939 F.2d 484 (7th Cir.1991),] where the plaintiff had manifested 'enthusiastic receptiveness to sexually suggestive jokes and activities.'" *Carr,* 32 F.3d at 1011 (quoting *Reed,* 939 F.2d at 491). We find absolutely no "enthusiastic receptiveness" in this case, and do not believe that Helene Curtis is claiming otherwise. Whatever Helene Curtis' purpose was in referring to Zorn's behavior, surely it could not have been to blame Zorn for the conduct of Decker, Green and Baldwin. The "blame-the-victim" game is simply not appropriate in this case (if it is ever appropriate, which, in light of *Carr,* we thankfully doubt). Zorn's resentment of the conduct of her male co-employees and her male supervisor is quite clear. Further, there is no reason why "unladylike" (or, at least for this case, should we say "manlike"?) behavior should provoke a hostile, harassing response from supposedly grown, professional men. *See id.* Even if we discount Zorn's statement that she did what she did in an effort "to be one of the boys" (a plausible explanation in itself), her conduct cannot be compared to the constant sexual banter, vulgarity, and insults

The facts of this case are more egregious than the facts presented in *Dey*. In *Dey*, the plaintiff was unable to recall the specifics of much of the alleged harassment. 28 F.3d at 1449. The plaintiff was able to recall only five incidents in any detail: (1) in early 1983 or 1984, the defendant's vice president and general counsel referred to a female colleague as a "flat-chested cunt;" (2) after returning from a vacation in Phoenix in 1983, the same man suggested to the plaintiff that she did not get a tan because she spent the week on her back in bed; (3) one day between November 1982 and September 1983, the same man told the plaintiff that "he would eat [her] no matter how [she] smelled;" (4) in March or April 1985, while riding in an elevator, the same man unzipped and zipped his pants after asking the plaintiff to hold his papers; and (5) in September or October 1985, the same man said to someone on the telephone that "there is a girl in my office going down on me" as the plaintiff leaned down to place some documents on his floor. *Dey*, 28 F.3d at 1449–50. Aside from these five incidents, the plaintiff could not recall what was said or done. *Id.* at 1450. There was never any physical component to the alleged harassment as the plaintiff concedes that she was never touched in a sexually suggestive manner. *Id.* Based on these allegations, the court concluded that "there is sufficient evidence to corroborate [the plaintiff's] charge of ongoing conduct to require a trial on that issue." *Id.* at 1456. The court reasoned that the five comments were overtly sexual and most were directed specifically at the plaintiff, and that the five incidents were extremely offensive and could be considered as such by a reasonable person in the plaintiff's position. *Id.* The court was not troubled by the vagueness of most of the plaintiff's allegations, stating that whether the plaintiff's allegations are credible is a question for the jury. *Id.*

This Court finds that the present case paints a more egregious picture than that presented in *Dey*. In this case, the plaintiff complains of harassing comments made not by one man, but by at least four men— Decker, Green, Baldwin and Marino. In ad-

dition, the plaintiff recalls not five but at least 20 sexually offensive comments or acts. Clearly the allegations in this case are more serious and offensive than the allegations in *Dey*. Therefore, if believed by the jury, Zorn's assertions would be sufficient to establish a claim of sexual harassment under Seventh Circuit precedent.

### c. Notice

Zorn must also show that a reasonable jury could find that Helene Curtis's response or lack thereof to the harassing behavior was negligent. *Carr*, 32 F.3d at 1012; *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990) (setting out the rule governing employer liability under Title VII). Helene Curtis argues that it was never given notice of the harassment, and, therefore, cannot be held liable. We disagree.

▬▬▬▬ Employers are not strictly liable for the conduct of co-workers. *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408. An employer can only be liable if it knew or should have known of the employee's acts and failed to take appropriate corrective action. *R.R. Donnelley*, 42 F.3d at 446; *Guess*, 913 F.2d at 465. But in this case we are not dealing with co-worker harassment. A substantial portion of Zorn's allegations include harassment by and in the presence of Decker, her direct supervisor. Pl.'s Add'l Facts ¶ 67. Decker was not only Zorn's supervisor, he was the General Manager of the entire Attractions line. Def.'s Resp. Add'l Facts ¶ 3. In this position, Decker had the power to hire, and, in fact, was responsible for hiring Zorn. Decker Dep. at 20. Zorn also alleges that Marino made harassing comments. Marino was even higher on the corporate ladder than Decker—he was the President of the entire Professional Division. Pl.'s Add'l Facts ¶ 6. In addition to Decker and Marino, Zorn implicates Green, the National Sales Manager of Attractions, and Baldwin, the Marketing Manager of Attractions. Moreover, Green served as Zorn's supervisor from April 1992, until she stopped working at Helene Curtis. Helene Curtis "is 'strictly liable for sexual harassment by supervisory person-

---

reaped on her by her male cohorts. *Id.* The asymmetry of the positions should also be con-

sidered: she was one woman; they were many men. *Id.*

nel who have the power to hire, fire, or promote....'" *Volk v. Coler,* 845 F.2d 1422, 1436 (7th Cir.1988) (quoting *Scott v. Sears, Roebuck & Co.,* 605 F.Supp. 1047, 1054–55 (N.D.Ill.1985) (citations omitted), *aff'd,* 798 F.2d 210 (7th Cir.1986)); *see also Meritor,* 477 U.S. at 78, 106 S.Ct. at 2411 (Marshall, J., concurring) ("Sexual harassment by a supervisor of an employee under his supervision, leading to a discriminatory work environment, should be imputed to the employer for Title VII purposes regardless of whether the employee gave 'notice' of the offense."). *Cf. Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 603 (7th Cir.1985) ("We hold that Title VII prohibits an employer, acting through one of its supervisory employees, from imposing sexual considerations as a condition of employment ..." regardless of whether the employer had knowledge of the harassment.). Decker, Marino, Green, and Baldwin all served national, supervisory roles with Helene Curtis.[18] As such, Helene Curtis is strictly liable for their conduct.

■■■ Helene Curtis points to *R.R. Donnelley* and *Saxton* as cases supporting a notice requirement even when supervisory personnel are involved. Def.'s Reply Mem. at 8–10. Helene Curtis' reliance on these cases is misplaced. In *R.R. Donnelley,* the plaintiff complained of harassment by her supervisor and harassment by her co-workers. 42 F.3d at 445. In discussing the alleged supervisor harassment, the Court noted that "[w]hether sexual harassment by a supervisor can be imputed to the employer corporation is governed by the principles of agency." *Id.* The Court never said one way or the other whether this meant that notice would be required, instead finding that the plaintiff's allegations of harassment by the supervisor were time-barred. *Id.* at 445–46. It was only in relation to harassment by co-employees that the Court discussed and imposed a notice requirement. *Id.* at 446.

Helene Curtis' reliance on *Saxton* is also misplaced. The issue in *Saxton* was not whether the employer had knowledge of the supervisor's conduct, but rather whether the employer's remedial action was sufficient. 10 F.3d at 535–36. Simply put, a requirement of actual or constructive knowledge may be necessary before holding an employer liable where the plaintiff complains of harassment by a co-employee, but such a requirement with respect to harassment by supervisory employees finds no support in either precedent or policy. *Horn,* 755 F.2d at 604. Holding Helene Curtis strictly liable for harassment by supervisory employees recognizes that "sex discrimination can best be eradicated by enforcing a strict liability rule that ensures compensation for victims and creates an incentive for the employer to take the strongest possible affirmative measures to prevent the hiring and retention of sexist supervisors." *Id.* at 605.

■■■ Even if Helene Curtis is not strictly liable for the sexual harassment that Zorn complains of, the Court's review of the record in this case makes it apparent that the sexual harassment Zorn complains of reached a level at which it can be inferred that the supervisor must have been aware that a hostile work environment existed. *See R.R. Donnelley,* 42 F.3d at 447. Decker, the supervisor, witnessed much of the harassing behavior of which Zorn complains (that is, if he was not participating himself). In addition Zorn complained to her immediate supervisor and to another general manager within Helene Curtis, Tom Ridgeway. Pl.'s Add'l Facts ¶¶ 83–85, 87. In this situation, we have no trouble concluding that the supervisor (Decker) must have been aware that a hostile work environment existed. That is enough to establish constructive knowledge on the part of Helene Curtis.

---

**18.** Helene Curtis claims that Baldwin never supervised anyone. Def.'s Resp. Add'l Facts ¶ 2. However, the deposition cited in support only reveals that Baldwin did not supervise anyone in *education.* Baldwin Dep. at 10 (emphasis added). This makes perfect sense considering that Baldwin was the Marketing Manager, not the Education Manager (that was Zorn's position).

Pl.'s Add'l Facts ¶ 5. We think that a jury could reasonably infer that Baldwin did have a supervisory role with the ability to fire people given the fact that Baldwin was on approximately the same level as Zorn, Def.'s Resp. Add'l Facts ¶ 5, and we know that Zorn had a staff of regional supervisors, Def.'s Facts ¶ 4, and that Zorn had the ability to fire people. ¶ 79.

■ In its behalf, we do note that Helene Curtis denies most of Zorn's allegations, but summary judgment is not a paper trial. *Waldridge*, 24 F.3d at 920. In reviewing the motion, we must view all reasonable inferences in the plaintiff's favor, and, after having done so, we conclude that judgment as a matter of law is not appropriate at this juncture. Defendant's motion for summary judgment as to Zorn's sexual harassment claim is denied.

### 2. Count I: Sexual Discrimination [19]

We turn now to Zorn's allegations of sexual discrimination. At issue is whether Zorn has established a prima facie case for sexual discrimination. Helene Curtis argues that it is entitled to summary judgment due to Zorn's failure to establish that she suffered an adverse employment action (one of the requirements for Zorn to establish a prima facie case). We disagree.

#### a. Zorn's Alleged Demotion

■ In order to have an adverse employment action,

> a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, *a demotion evidenced by a decrease in wage or salary*, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993) (emphasis added).[20] Zorn charges that she was demoted in April, 1992, when she was told to report to Green instead of Decker, and when she was given lower prestige work on top of her customary job responsibilities. We do not agree that Zorn was ever demoted.

■ The April 1992 procedure change of which Zorn complains amounts to no more than an alteration of job duties. *Crady*, 993 F.2d at 136. The change in reporting procedures did not bring with it a decrease in pay or a decrease in the amount of responsibility given to Zorn. In fact, as Zorn admitted in her deposition, Zorn's salary was *increased* at every performance appraisal, Zorn Dep. at 194, and she was given increased responsibilities. *Id.* at 174–75. Further, Zorn's job title remained at all times "national education manager." *Id.* In short, Zorn has failed to present any evidence that would support the inference that she was demoted.

■ Even if we assume that Zorn was demoted, she still cannot succeed because Helene Curtis presented a legitimate, nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094 (once the plaintiff succeeds in establishing a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its action). Helene Curtis stated that the reassignment of Zorn was based on legitimate business reasons. Def.'s Reply Add'l Facts ¶ 72. Specifically, Helene Curtis states that the Attractions division was struggling financially, and, as a result, the department was reorganized. Def.'s Facts ¶¶ 9–10. As a result of this reorganization, Zorn took on additional responsibilities, lost some employees, and had to report directly to Green. *Id.* ¶¶ 10–11. Helene Curtis further states that Green also took on increased responsibilities, and Green also lost employees. *Id.* The financial difficulties eventually forced Helene Curtis to close down the Attractions line, terminating

---

19. The first Count of Zorn's complaint includes an allegation of sexual discrimination as well as sexual harassment.

20. As Zorn correctly points out, *Crady* was an age discrimination case brought under 29 U.S.C. § 621, et. seq. Pl.'s Mem. in Opp'n at 35. That distinction, however, is of no consequence. As in the present case, *Crady* analyzed the case under the *McDonnell Douglas* burden-shifting analysis. *See Crady*, 993 F.2d at 134. Further, no matter whether the case proceeds under Title VII or the Age Discrimination Act, the question is the same: was there an adverse employment action? We know of no case where the definition of "adverse employment action" changes depending on the statute under which a suit was brought.

Green and Decker. *Id.* ¶ 9.[21] In short, Helene Curtis states that it had a legitimate business reason for the change in Zorn's job responsibilities. At this point, the burden shifts back to Zorn. Zorn has not even attempted to establish that Helene Curtis' proffered reason was a pretext. As a result, even if we were to find that Zorn was demoted (which we do not), Helene Curtis supplied a viable, nondiscriminatory reason for its actions.

### b. Zorn's Constructive Discharge

■ Zorn also asserts that she suffered an adverse employment action because she was constructively discharged by Helene Curtis. Pl.'s Add'l Facts ¶ 156; Pl.'s Mem. in Opp'n at 36. Helene Curtis argues that summary judgment should be granted as to this allegation because the constructive discharge claim was not raised in Zorn's EEOC complaint.[22] We disagree. A Title VII plaintiff must file a timely charge with the EEOC before commencing a lawsuit. 42 U.S.C. § 2000e–5(e); *Alexander v. Gardner–Denver Co.,* 415 U.S. at 47, 94 S.Ct. at 1019. Allegations not included in the EEOC charge may not be asserted in a Title VII complaint. *Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 139 (7th Cir.1994); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993). This is not to say that the Title VII complaint must contain verbatim the same charges as were mentioned in the EEOC charge. A plaintiff may proceed on a Title VII claim if the claim is "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d at 167. This standard is a liberal one. *Babrocky,* 773 F.2d at 864.

■ Zorn's constructive discharge claim was not specifically raised in her EEOC charge. The EEOC charge states that she collapsed and was hospitalized for depression and suicidal ideations on August 31, 1992; she was subjected to a systematic campaign of harassment; she was held to a higher standard; she was given unrealistic work demands; she was ignored at meetings; she was unfairly criticized and blamed for events beyond her control, and she was ordered to perform clerical tasks. These are some of the very elements that constitute Zorn's constructive discharge claim. Given the fact that Helene Curtis knew that Zorn never returned to work after being hospitalized for depression on August 31, 1992, and given the fact that many of the elements of Zorn's constructive discharge claim are set out in her EEOC claim, we find that the constructive discharge claim is sufficiently "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins,* 538 F.2d at 167.

■ An employer constructively discharges an employee if it makes the employee's working conditions so intolerable that the employee is forced to resign. *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). However, "to be actionable under Title VII the work conditions need to be more than intolerable—they need to be intolerable in a *discriminatory* way." *Chambers,* 17 F.3d at 1005 (emphasis added). In order to establish a constructive discharge claim, the employee must establish that "a reasonable employee would have felt compelled to resign under the circumstances of th[e] case." *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423 (7th Cir. 1989). In addition, the employee must seek legal redress while remaining in his or her

---

**21.** Baldwin was previously terminated for cause based on performance issues. Marino Dep. at 58.

**22.** Helene Curtis goes even further and argues that the constructive discharge claim was raised for the first time on summary judgment. Def.'s Reply Mem. at 12. While we concede that nowhere in Zorn's complaint are the words "constructive discharge" mentioned, we believe that the complaint sufficiently sets out facts which support a constructive discharge claim. *See*

Compl. ¶¶ 21–31. And it is settled law that a complaint need not point to the appropriate law in order to raise a claim for relief under Fed. R.Civ.Pro. 8; rather, a complaint sufficiently raises a claim so long as relief is possible under any set of facts that can be established consistent with the allegations. *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134 (7th Cir.1992); *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir. 1992).

job unless faced with an aggravated situation beyond ordinary discrimination. *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir.1993).

Helene Curtis argues that Zorn cannot establish that she was constructively discharged. We disagree. Although Zorn has not clearly set out her constructive discharge claim, after reviewing the record in this case, this Court reads Zorn's constructive discharge claim as alleging that the constant sexually offensive behavior, and the discriminatory treatment she endured made the workplace discriminatorily intolerable, forcing her to involuntarily stop working.

In its defense, Helene Curtis has offered a justifiable business reason for some of the additional work that Zorn was given, stating that Zorn, as well as Green, had to take on additional responsibilities as part of a reorganization plan. Def.'s Reply Add'l Facts ¶ 72. But Helene Curtis has not offered any reason, let alone a legitimate, non-discriminatory reason, for why Zorn was left alone to do work by herself while her male colleagues would go out for lunch, Pl.'s Add'l Facts ¶ 81; or why Zorn had to check the men into hotel rooms and clean up after meetings, *Id.* ¶ 110; or why Zorn had to reserve tables for Decker at a trade show in August, 1992, *Id.* ¶ 107; or why Zorn was instructed to clean out the supply room, *Id.* ¶ 98; or why Zorn had to sit or stand next to Decker at business functions, *Id.* ¶¶ 55, 58; or why Green said to Zorn "Shelly, if I were you I would quit" Zorn Dep. at 851; or why Decker threatened to fire Zorn when a shipment was misrouted by the cargo carrier. Pl.'s Add'l Facts ¶¶ 133–36. Similarly, Helene Curtis has not attempted to offer any legitimate business reason for the sexually offensive conduct and comments that Zorn endured and that we have previously discussed in some detail.

Helene Curtis, citing *Landgraf v. USI Film Prods.*, 968 F.2d 427 (5th Cir.1992), *cert. granted in part,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), *aff'd,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), argues that establishing a hostile work environment in violation of Title VII does not necessarily support a constructive discharge claim. It is true that in *Landgraf,*

the Fifth Circuit upheld a decision in which sexual harassment was found to be sufficiently severe to establish a hostile work environment claim, but not severe enough to support a constructive discharge claim. 968 F.2d at 429–30. However, this Court does not read *Landgraf* as standing for the proposition that facts supporting a hostile work environment claim in violation of Title VII can *never* support a constructive discharge claim. Rather, in *Landgraf,* the Fifth Circuit determined that the district court did not err when "after hearing all the testimony *in this case,* [the court] concluded that Landgraf resigned for reasons unrelated to harassment." *Id.* at 430 (emphasis added). In addition, the court found that the sexual harassment was not severe enough that a reasonable person would have felt compelled to resign—a conclusion that was strengthened by the fact that the defendant had taken actions to alleviate the problem. *Id.*

This case presents a situation different from the one in *Landgraf.* In this case, Zorn asserts that the sexual harassment combined with discriminatory treatment caused her to suffer a mental and nervous breakdown, forcing her to resign. There is not even a hint that Zorn resigned for other reasons, nor is there any suggestion that Helene Curtis took any steps to alleviate the intolerable behavior. Therefore, this case is not controlled by *Landgraf.* Rather, in deciding this motion this Court relies on *Rodgers v. Western–Southern Life Ins., Co.,* 12 F.3d at 668.

In *Rodgers,* the plaintiff's supervisor, who also hired the plaintiff, made insulting racial remarks, as well as many race-neutral epithets. 12 F.3d at 671. In addition to verbal abuse, the plaintiff's supervisor on one occasion dumped out the contents of the plaintiff's desk. *Id.* Despite the job-related stress resulting from the harsh treatment and racial language, the plaintiff continued to work for the defendant. *Id.* At one point, the plaintiff was given additional work demand that the plaintiff found to be unbearable. *Id.* at 672. When the plaintiff complained, his supervisor threatened to fire him. *Id.* Subsequently, the plaintiff resigned for health reasons. *Id.* After carefully reviewing the evidence in the case, the

Seventh Circuit was "persuaded that [the] racist comments and taunts, though perhaps not the sole factor, contributed significantly to the stress condition that compelled [the plaintiff] to resign...." *Id.* at 677. The court was not troubled by the fact that the plaintiff did not simply quit immediately after the stressful environment began, stating that: "[t]he employee may quit 'cold turkey' or ... 'may experience a prolonged period of turmoil.'" *Id.* (quoting *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991)). In discussing the plaintiff's constructive discharge claim, the court noted that an employee must seek legal redress while remaining on the job unless confronted with an aggravated situation. *Id.* Although the plaintiff in *Rodgers* never sought legal redress,

> the fact that the insults generating the racially hostile environment flowed from the mouth of the supervisor—indeed, the highest ranking employee in the [plaintiff's] office—persuades us that [the plaintiff] encountered 'aggravated' discrimination. Under these circumstances, we agree [with the district court] that a reasonable employee would have felt compelled to resign.

*Id.*

Zorn, like the plaintiff in *Rodgers,* alleges that she endured verbal abuse and discriminatory treatment while employed by the defendant. *See, e.g.,* Pl.'s Add'l Facts ¶¶ 31, 33, 81, 105–06. Zorn, like the plaintiff in *Rodgers,* alleges that she was given unbearable work demands. *Id.* ¶¶ 71, 74, 96. Zorn, like the plaintiff in *Rodgers,* was told she would be fired if she did not fulfill all of the demands put on her. *Id.* ¶ 133–36. Following *Rodgers,* this Court finds that a reasonable jury could determine that the alleged sexually offensive and discriminatory atmosphere contributed significantly to the stressful conditions that resulted in Zorn's mental and nervous breakdown, forcing her to resign.

■ Admittedly, Zorn did not seek legal redress while employed with Helene Curtis. As in *Rodgers,* however, Zorn allegedly endured a sexually hostile environment flowing in large part directly from the mouth of her supervisor, persuading us that she encoun-

tered aggravated discrimination, making it unnecessary for her to have sought legal redress. *See Rodgers,* 12 F.3d at 677. Zorn's claim is not automatically defeated by the fact that she endured the stressful environment for over two years because, as the Seventh Circuit observed in *Rodgers,* the employee may either quit "cold turkey" or endure a lengthy period of turmoil. *Id.*

■ In deciding this motion, this Court's only function is to determine whether a factual dispute exists warranting a trial. *Waldridge,* 24 F.3d at 920. We must draw all inferences in Zorn's favor. In so doing, we find that there is ample evidence showing that the sexual harassment and discriminatory treatment that Zorn alleges she endured rendered the working conditions at Helene Curtis so intolerable that a reasonable person would have felt compelled to resign. If believed by a jury, Zorn's assertions would be sufficient to establish a constructive discharge claim under Seventh Circuit precedent. The defendant's motion for summary judgment as to Zorn's sexual discrimination claim is denied.

### 3. Count II: Retaliation

■ It is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful practice by [Title VII]." 42 U.S.C. ¶ 2000e–3(a). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in statutorily protected expression; (2) she suffered adverse action by her employer; and (3) there is a causal connection between the protected expression and the adverse action. *Rennie v. Dalton,* 3 F.3d 1100, 1109 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). If the plaintiff makes such a showing, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action. *McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. at 1817. If the defendant articulates such a justification, the burden shifts back to the plaintiff to prove that the proffered reasons are a pretext. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see also Dey,* 28 F.3d at 1457

(applying the burden-shifting approach to a claim of retaliation). Helene Curtis argues that Zorn cannot establish these elements. We agree.

As discussed above, Zorn has presented sufficient evidence giving rise to an inference that she suffered an adverse employment action in the form of a constructive discharge. The only question, then, is whether Zorn can satisfy the other two elements. Helene Curtis argues that Zorn never engaged in statutorily protected behavior, contending that Zorn's alleged complaints to Decker, Ridgeway and the independent psychologists were insufficient. We do not need to decide this issue because we find that Zorn has failed to establish a causal link between her complaints and the adverse employment action.

▮▮▮ A plaintiff in a retaliation action may establish a causal link through evidence that she suffered an adverse consequence shortly after the protected activity. *Dey*, 28 F.3d at 1458. In this case, however, the events giving rise to Zorn's alleged constructive discharge began before she ever complained to anyone. The events that Zorn alleges occurred after she complained were the same as the events Zorn alleges occurred before she complained. We fail to see how, in such a situation, the constructive discharge can be causally linked to the protected activity. It appears to this Court that Zorn may well have suffered a mental and nervous breakdown, forcing her to resign, regardless of whether or not she registered any complaints. In other words, Zorn has not established a causal relationship between her complaints and the constructive discharge. Therefore, Zorn has failed to establish a prima facie case of retaliation. We grant the defendant's motion for summary judgment

insofar as Zorn's retaliation claim is concerned.

**4. Count III: Intentional Infliction of Emotional Distress**

▮▮▮ As a final claim for relief, Zorn brought a claim of intentional infliction of emotional distress against Helene Curtis and Decker. In their motion for summary judgment, the defendants argued that Zorn's intentional infliction of emotional distress claim is barred by exclusive state law remedies under the Illinois Workers' Compensation Act, 820 ILCS 305/5, 305/11, and the Illinois Human Rights Act, 775 ILCS 5/1–101, *et seq.* Def.'s Mem. In Supp. Of Summ.J. at 12–13.[23] Alternatively, the defendants argued that if Zorn's claim is not barred, she nonetheless failed to allege conduct serious enough to constitute intentional infliction of emotional distress. *Id.* at 13–15. Zorn completely failed to respond to these arguments. As we noted in our earlier discussion of summary judgment standards, the non-movant bears the burden of responding to the motion for summary judgment by bringing forth facts creating a genuine issue of material fact warranting a trial. *See Waldridge v. American Hoechst Corp.*, 24 F.3d at 920 (stating that "if the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her.") Zorn's complete failure to respond in any way to the defendants' argument constitutes a failure to establish that a genuine issue of material fact existed. As such, the defendants' motion for summary judgment as to the state law claim of intentional infliction of emotional distress is granted.

---

**23.** Illinois courts have read §§ 305/5 and 305/11 of the Illinois Workers' Compensation Act as barring suits against employers for injuries intentionally inflicted by one employee upon another. *See, e.g., Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 463, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (1990). Similarly, under § 8–111(C) of the Illinois Human Rights Act, if a plaintiff's common law action is construed as seeking redress for a civil rights violation within the meaning of the Human Rights Act, Illinois circuit courts lack jurisdiction to hear the case. *See*

*Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill.2d 507, 515, 203 Ill.Dec. 454, 457, 639 N.E.2d 1273, 1276 (1994) (interpreting the Human Rights Act). In *Geise*, the Illinois Supreme Court held that allegations "inextricably linked" to the concept of sexual harassment must be construed as alleging civil rights violations within the scope of the Act, depriving Illinois courts of jurisdiction. *Id.* at 515–16, 203 Ill.Dec. at 457–58, 639 N.E.2d at 1276–77. *A fortiori*, a federal district court would likewise be deprived of jurisdiction to hear the claim. *Lynam*, 886 F.Supp. at 1448.

## CONCLUSION

Decker's motion for summary judgment is granted on all counts. Helene Curtis' motion for summary judgment with respect to the retaliation (Count II) and intentional infliction of emotional distress (Count III) claims is granted. Helene Curtis' motion for summary judgment with respect to the sexual harassment and sexual discrimination claims (Count I) is denied. A final pretrial order in this case shall be filed on November 1, 1995. A status hearing will be held on October 20, 1995, at 9:00 a.m. for the explicit purpose of setting a firm trial date.